845 A.2d 793

**Gregory L. SHAMBACH, Petitioner/Appellant,**

**v.**

**Richard W. BICKHART, Respondent/Appellee.**

**In re Pennsylvania General Election for Snyder County Commissioner, November 4, 2003.**

**Appeal of Gregory L. Shambach of Recount and Certification of Election Returns.**

Supreme Court of Pennsylvania.

Submitted Feb. 17, 2004.

Decided March 26, 2004.

Michael V. Brown, for Gregory L. Shambach.

Monna Accurti, for Bureau of Elections.

Thomas C. Clark, Middleburg, for Richard W. Bickhart.

Before CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN, BAER, JJ.

## OPINION OF THE COURT

Justice NIGRO.

Appellant Gregory L. Shambach appeals from the Commonwealth Court's order declaring Appellee Richard W. Bickhart the winner of the third County Commissioner seat on the Snyder County Board of Commissioners based on its inclusion of ten write-in votes cast on Bickhart's behalf in the final tally. For the reasons that follow, we affirm.

Shambach and Bickhart along with two other persons, Rick Bailey and Steven Bilger, were formally listed on the ballot as candidates for three Snyder County Commissioner positions in the November 4, 2003 general election.[1] After the election returns were counted and tallied, the Snyder County Return Board ("Board") determined that Bailey and Bilger had won two of the County Commissioner positions, but that the winner of the third position remained undecided as Shambach and Bickhart had both come in third in the election, receiving 2,484 votes each. As a result of the tie, the Board ordered a recount. Following the recount, on November 18, 2003, the Board determined that Shambach had received 2,493 votes, and Bickhart had received 2,500 votes, and accordingly, certified Bickhart as the winner of the third position.[2]

The next day, Shambach appealed from the Board's decision to the trial court pursuant to Section 1407 of the Election Code, 25 P.S. §§ 2600—3591.[3] Among other complaints,

1. Shambach and Bickhart were the Democratic nominees and Bailey and Bilger were the Republican nominees.

2. Representatives of both Shambach and Bickhart observed the recount.

3. Act of June 3, 1937, P.L. 1333. Section 1407 of the Election Code states:

Shambach objected to the Board's inclusion of ten ballots containing write-in votes for Bickhart in the final tally. Shambach argued that these ten votes were invalid because a voter may not write in the name of a person who is already listed as a candidate on a ballot pursuant to Section 1112 A(b)(3) of the Election Code, which provides as follows:

> At all other elections, the voter shall vote for the candidates of his choice for each office to be filled, according to the number of persons to be voted for by him for each office, by making a cross (x) or check (/) mark or by making a punch or [other] mark in the square opposite the name of the candidate, *or he may so mark the write-in position provided on the ballot for the particular office and, in the space provided therefor on the ballot and/or ballot envelope, write the identification of the office in question and the name of any person not already printed on the ballot for that office,* and such mark and written insertion shall count as a vote for that person for such office.

25 P.S. § 3031.12(b)(3) (emphasis added).[4] Shambach also argued that write-in ballots for listed candidates were invalid under Optical Scan Standard 14, which was part of a general "Notice" published by the Pennsylvania Department of State in the August 2, 2003 Pennsylvania Bulletin (the "Notice").[5]

> Any person aggrieved by any order or decision of any county board regarding the computation or canvassing of the returns of any primary or election, or regarding any recount or recanvass thereof under sections 1701, 1702 and 1703 of this act, [footnote omitted] may appeal therefrom within two days after such order or decision shall have been made, whether then reduced to writing or not, to the court of common pleas of the proper county, setting forth why he feels that an injustice has been done, and praying for such order as will give him relief.
> 25 P.S. § 3157, Act of June 3, 1937, P.L. 1333, art. XIV, § 1407, *affected by* Act of April 28, 1978 P.L. 202, No. 53, § 2(a)[1193], effective June 27, 1978.

4. Act of June 3, 1937, P.L. 1333, art. XI–A, § 1112–A, *amended by* Act of July 11, 1980, P.L. 600, No. 128, § 4.

5. Optical Scan Standard 14 states that: "A properly cast write-in vote shall contain a mark in the target area and, in the space provided, the written name of a candidate whose name does not appear on the ballot for that office." 33 Pa. Bull., No. 31 at 3970–73. It also includes examples of ballots that are invalid according to this standard. *See id.*

Following a hearing, the trial court entered an order on November 24, 2003, striking the ten write-in votes for Bickhart.[6] After deciding additional objections raised by Bickhart, the trial court determined that the final tally was 2,491 votes for Shambach and 2,490 votes for Bickhart, and thus declared Shambach the winner of the third County Commissioner position. On December 15, 2003, the trial court issued an opinion, explaining initially that it found that the ten write-in votes had been clearly cast for Bickhart.[7] Nevertheless, the trial court determined that the ten votes were invalid based on Optical

One such example shows a ballot on which someone has written the name of a candidate already listed on the ballot on the line provided for a write-in vote and filled in the oval next to that name. *See id.* at 3973.

The Department of State adopted the Notice, in which Optical Scan Standard 14 is included, to comply with the Help America Vote Act of 2002, 42 U.S.C. § 15481(a)(6), which requires that each state adopt uniform and nondiscriminatory standards to define what constitutes a vote for voting systems used by the state in elections involving a federal office. According to the Notice, the Department of State based all of the standards in the Notice on the provisions of the Election Code. 33 Pa. Bull., No. 31, at 3935.

6. The trial court also struck one write-in vote cast for Shambach. Shambach did not challenge the trial court's action in this respect before the Commonwealth Court and he also does not challenge that action in his petition to this Court.

Moreover, although Shambach had initially raised several objections to the Board's decision in his appeal to the trial court, after the trial court decided to strike the ten write-in votes for Bickhart, Shambach moved to withdraw his other objections, and the trial court granted that motion.

7. The trial court elaborated that because four of the write-in votes were for "Richard Bickhart," they were undeniably cast for Bickhart. The trial court further stated that although two of the write-in votes were for "Bud Bickhart" and one was for "R. Bud Bickhart," these votes were also clearly cast for Bickhart because "Bud" is indisputably Bickhart's nickname. Lastly, the trial court found that three write-in votes that were simply for "Bickhart" were also clearly for Bickhart because there was no other candidate in the election with the surname of Bickhart. *See id.* at 4 (*quoting Appeal of McCracken*, 370 Pa. 562, 88 A.2d 787, 789 (1952) ("A ballot may be counted which contains a candidate's surname only although there are other persons in the borough having the same surname, it being shown that there was no other person of such name who was a candidate for the same or any other office. . . .")). Shambach does not dispute the trial court's findings in these respects.

Scan Standard 14, which was a binding administrative rule.[8] The trial court found that it was obliged to abide by Optical Scan Standard 14 even though, in its view, "the Standard is contrary to the case law of this Commonwealth by having the possible effect of not counting a ballot from which the voter's intent could clearly be discerned." Slip op. at 5; *see also* N.T., 11/24/03, at 17–18.

Bickhart appealed from the trial court's order to the Commonwealth Court, which issued a *per curiam* order on December 18, 2003, reversing the trial court's decision to the extent that it struck the ten write-in votes for Bickhart and stating that "the final count for the vote for commissioner as it relates to Greg L. Shambach and Richard W. Bickhart is 2,491 for Mr. Shambach and 2,500 for Mr. Bickhart." On December 24, 2003, the Commonwealth Court filed an opinion explaining its order. The Commonwealth Court initially held that the trial court improperly found that Optical Scan Standard 14 was binding upon it when the standard was merely published as a statement of policy, rather than as a regulation with the force and effect of law.[9] *See In re: Pennsylvania General Election*

8. Citing to this Court's decision in *Lloyd v. Pennsylvania Medical Professional Liability Catastrophe Loss Fund*, 573 Pa. 114, 821 A.2d 1230, 1234 (2003), the trial court stated that administrative rules adopted by an agency "are binding upon a reviewing court as part of the statute" if they are: (1) within the agency's power; (2) issued pursuant to proper procedure; and (3) reasonable. Slip op., at 5. Applying that test, the trial court determined that Optical Scan Standard 14 must be binding because: (1) it was within the Department of State's authority; (2) there was no claim that the Department followed an improper procedure; and (3) the standard was undeniably reasonable as it tracked Section 1112-A(b)(3). *See id.* at 5–6.

9. The court pointed out that the Department of State had directed that Optical Scan Standard 14 be published simply as a notice in the Pennsylvania Bulletin, rather than as a regulatory law. *See In re: Pennsylvania General Election for Snyder County Commissioner*, 841 A.2d at 595 (Pa.Commw.2003) (*citing* 25 P.S. § 2624(h)). Moreover, the court found that the standard was not a binding regulation as it was not promulgated according to the notice and comment procedures set forth in the Commonwealth Documents Law, which it stated are necessary for an agency regulation to be binding. *See id.* (*citing R.M. v. Pennsylvania Housing Finance Agency of Commonwealth*, 740 A.2d 302, 305–06 (Pa.Commw.1999), *appeal denied*, 563 Pa. 669, 759 A.2d 390 (2000)).

*for Snyder County Commissioner,* 841 A.2d 593, 595 (Pa. Commw.2004). Nevertheless, the Commonwealth Court found that Section 1112–A(b)(3) of the Election Code, which tracked the language of Optical Scan Standard 14, was binding law and thus, the write-in votes could be invalid if Section 1112–A(b)(3) required that result. *See id.*

In deciding this question, the Commonwealth Court looked to this Court's decision in *Appeal of James,* 377 Pa. 405, 105 A.2d 64 (1954), where we found that a section of the Election Code containing language very similar to that at issue in Section 1112–A(b)(3) must be liberally construed in favor of a voter's right to vote. *See In re: Pennsylvania General Election for Snyder County Commissioner,* 841 A.2d at 595. The Commonwealth Court noted that this liberal construction led the Court in *James* to conclude that the section at issue permitted write-in votes to be cast for candidates already listed on the ballot if: (1) the voter had not attempted to fraudulently cast the vote; and (2) the voter's intent was clear. *See id.* Citing to the principle of statutory construction that where this Court has interpreted a statute in one way, the General Assembly is presumed to intend the same construction to be placed upon such language in other statutory provisions, *see* 1 Pa.C.S. § 1922(4), the Commonwealth Court then found that Section 1112 A(b)(3), like the statute at issue in *Appeal of James,* must be construed to mean that "a voter may not cast a write-in vote for persons whose names are printed on the ballot, except where there is no indication of fraud, *i.e.,* double voting, and the intent of the voter is clear." *In re: Pennsylvania General Election for Snyder County Commissioner,* 841 A.2d at 597. The Commonwealth Court therefore applied this test in the instant case and found both that the voters who wrote in Bickhart's name on the ballot clearly intended to vote for him and that there was no sign of fraud involved with those ballots. *See id.*[10] Thus, the court

---

**10.** In finding that there was no sign of fraud, the Commonwealth Court noted:

> During the recount, the members of [the] County Board actually held the ballot cards in their hands and examined the entire ballot. If any of the ten voters had cast a regular vote for Bickhart in addition to

ultimately held that the ten write-in votes cast for Bickhart must be counted in his favor. *See id.*

Judge Leavitt dissented from the Commonwealth Court majority's decision, reasoning that a court must find that a ballot was validly cast before attempting to ascertain a voter's intent. *See id.* Thus, finding that the ten write-in votes were not validly cast pursuant to Section 1112–A(b)(3), Judge Leavitt held that the majority erred in counting the ballots merely because the voters' intentions were clear. *See id.* at 598.

Thereafter, Shambach filed a petition for allowance of appeal as well as a request for a stay of the Commonwealth Court's order with this Court.[11] We granted Shambach's request for a stay on December 31, 2003, and subsequently entered an order granting allocatur on February 17, 2004.

Echoing Judge Leavitt's dissent, Shambach initially argues that our case law requires that a court first ascertain whether a ballot was validly cast before attempting to discern the voter's intent. Shambach therefore contends that because the ten write-in ballots were improperly cast pursuant to Section 1112 A(b)(3) of the Election Code, they were invalid regardless of whether the voters' intentions were clear and the ballots were free from fraud. Shambach further argues that the Commonwealth Court erred in finding that Section 1112–A(b)(3) was similar to the statute at issue in *Appeal of James* because that statute involved paper ballots and Section 1112–A(b)(3) concerns voting systems that use automatic tabulating equipment, such as the optical scanning system used here. According to Shambach, Section 1112–A(b)(3) is more akin to Section 1216(e), which bars the inclusion of write-in votes for candidates already listed on a voting machine and which this Court upheld as a reasonable restriction in *Appeal of Yerger*, 460 Pa. 537, 333 A.2d 902 (1975). In fact, Shambach contends

the write-in vote, the members of the County Board conducting the recount would have seen it upon examination of the ballot cards. *In re: Pennsylvania General Election for Snyder County Commissioner*, 841 A.2d at 597.

11. Shambach initially filed a request for a stay from the Commonwealth Court, however, that court denied his request.

that Section 1112–A(b)(3) must be interpreted as barring write-in votes based on our decision in *Appeal of Yerger* because the reasons we found for upholding the restriction there, namely, preserving the efficiency of the voting machines and protecting against double voting, are also present with regard to the optical scanning system used here.[12]  We disagree.

There is a "longstanding and overriding policy in this Commonwealth to protect the elective franchise." *Petition of Cioppa*, 533 Pa. 564, 626 A.2d 146, 148 (1993); *see also In re: Weiskerger Appeal*, 447 Pa. 418, 290 A.2d 108, 109 (1972) ("Our goal must be to enfranchise and not to disenfranchise."). Thus, although election laws must be strictly construed to prevent fraud, they "ordinarily will be construed liberally in favor of the right to vote." *Appeal of James*, 105 A.2d at 65 (*quoting* 29 C.J.S., Elections, § 7, p. 27); *see also In re: Nomination Petition of Johnson*, 509 Pa. 347, 502 A.2d 142, 146 (1985); *In re: Mellody Appeal*, 449 Pa. 386, 296 A.2d 782, 784 (1972); *In re: Cole's Election*, 223 Pa. 271, 72 A. 510, 511 (1909).  To that end, we have held that ballots containing mere minor irregularities should only be stricken for compelling reasons. *See In re: Mellody Appeal*, 296 A.2d at 784; *In re: Petitions to Open Ballot Boxes*, 410 Pa. 62, 188 A.2d 254, 256 (1963); *Appeal of Gallagher*, 351 Pa. 451, 41 A.2d 630, 632 (1945).  As we recognized in *Appeal of Gallagher*, "[m]arking a ballot in voting is not a matter of precision engineering but of an unmistakable registration of the voter's will in substantial conformity to the statutory requirements."  41 A.2d at 632.

In *Appeal of James*, the board of elections determined that the appellant, Samuel A. James, was the winner of an election for a council seat.  James' opponent, Theodore Rushe, however, challenged the election results, arguing that because James was formally listed on the election ballot, 151 write-in votes

12. Shambach does not challenge the Commonwealth Court's finding that Optical Scan Standard 14 was not a binding regulation.  Thus, that issue is not before this Court.

were improperly calculated in his favor based on Section 1003(e) of the Election Code, which provides, as follows:

There shall also be left at the end of each group of candidates for [offices other than President and Vice President of the United States], as many blank spaces as there are persons to be voted for for such office, *in which space the elector may insert the name of any person or persons whose name is not printed on the ballot as a candidate for such office.*

25 P.S. § 2963(e) (emphasis added).[13]  The county board of elections agreed with Rushe that the 151 write-in votes were void pursuant to Section 1003(e) and, as a result, declared Rushe the winner.  On appeal, this Court reversed.  In doing so, we reviewed a representative ballot that had been introduced as an exhibit before the trial court, and noted that although James' name was stated twice on the ballot, only one vote had been cast for him, and thus there was no claim of fraud.  *See id.* at 65.  Moreover, we found that the ballot "unmistakably, unerringly and precisely demonstrated [the voters'] intention[s] to vote for James." *Id.* at 65–66.  Therefore, because there was no fraud involved and the will of the voters who cast the write-in votes was clear, we held that "it would be a stultification of the very principle of democracy behind the Election Code" to deprive James of the 151 write-in votes simply on the basis that the Code did not expressly permit voters to cast write-in votes for listed candidates. *Id.* at 66–67.  Accordingly, we liberally construed the Election Code so as to allow the 151 write-in votes to be counted for James.  *See id.*

Twenty years after *Appeal of James,* we issued a decision in *Appeal of Yerger,* 460 Pa. 537, 333 A.2d 902, another election contest involving the issue of whether write-in ballots for candidates already listed on a ballot could be counted.  In that case, the appellant, William Yerger, was declared the winner

---

**13.** Act of June 3, 1937, P.L. 1333, art. X, § 1003, *amended by* Act of April 24, 1947, P.L. 68, § 1; Act of Jan. 8, 1960, P.L. (1959) 2142, § 2; Act of Aug. 13, 1963, P.L. 707, § 17, effective Jan. 1, 1964; Act of July 16, 1968, P.L. 354, No. 175, § 1; Act of Dec. 10, 1974, P.L. 835, No. 280, § 2; Act of Dec. 2, 1976, P.L. 1221.

of an election for Jackson Township's tax collector after it was determined that he obtained two more votes than his opponent, Norman Frederick. Supporters of Frederick appealed to the trial court, challenging the election board's failure to count eight write-in votes that had been cast for Frederick. Yerger argued, however, that because voting machines had been used in the election, the write-in votes were properly voided pursuant to Section 1216(e) of the Election Code, which states:

> A voter may, at any primary or election, vote for any person for any office, for which office his name does not appear upon the voting machine as a candidate, by an irregular ballot containing the name of such person deposited, written or affixed in or upon the appropriate receptacle or device provided in or on the machine for that purpose, and in no other manner.... *With [exceptions not relevant here], no irregular ballot shall be cast on a voting machine for any person for any office, whose name appears on the machine as a candidate for that office, and any ballot so cast shall be void and not counted.*

25 P.S. § 3056(e) (emphasis added).[14] The trial court concluded that Section 1216(e)'s proscription against write-in votes for candidates whose names already appeared on the voting machine violated the requirement in article seven, section six of the Pennsylvania Constitution that election laws be uniform because, as this Court made clear in *Appeal of James*, write-in votes for candidates whose name already appeared on a paper ballot could be counted pursuant to the Election Code.[15] Thus, the trial court ordered that the eight write-in votes must be counted, and declared Frederick the winner.

On appeal to this Court, we reversed. We initially noted that the language in Section 1216(e) unambiguously required that write-in votes cast for candidates already named on the

14. June 3, 1937, P.L. 1333, art. XII, § 1216, *amended by* Act of Nov. 21, 1969, P.L. 309, § 1.

15. Article VII, section 6 of the Pennsylvania Constitution provides, with exceptions not relevant here, that "[a]ll laws regulating elections by the citizens ... shall be uniform throughout the State...."

machine "be void[ed] and not counted," and that the statute was "to be given full effect in accordance with its words unless that result is prohibited by the Constitution." *Appeal of Yerger*, 333 A.2d at 904–05. Turning then to the trial court's finding that Section 1216(e) violated the uniformity clause in the Pennsylvania Constitution, we noted that the clause only requires like treatment where the "same circumstances" are present and "the Legislature is not forbidden to draw distinctions where difference in treatment rests on some substantial basis." *Id.* at 906 (*quoting Kerns v. Kane,* 363 Pa. 276, 69 A.2d 388, 393 (1949)). We then found that there were indeed two substantial bases for affording different treatment to write-in votes cast on voting machines. First, we found that the ban against write-in votes for listed candidates on voting machines was necessary to maintain the speedy and efficient operation of the machines. As we explained:

Allowing write-in votes for those appearing on the machine would increase the time and effort required to count the votes. By ignoring the speedy and efficient means of voting for such candidates provided by the regular operation of the machine, the voter casting an irregular vote would, to that extent, defeat the very purpose of using voting machines. When dealing with a comprehensive and carefully drawn legislative scheme for the conduct of elections, we must take care not to consider the particular elements of the scheme without regard to their place in the entire structure. Otherwise, the legislative plan may be frustrated by deviations, each seemingly reasonable in itself but destructive of the carefully designed structure.

333 A.2d at 906.

Second, we found that Section 1216(e)'s bar was a safeguard against voters casting more votes than allowed or votes for the same candidate twice, *i.e.,* "double voting." *See id.* While not explicitly explained in our opinion, it seems that the procedure set forth in Section 1216(e) for casting write-in votes makes it particularly difficult to ascertain if double voting has occurred because it provides for write-in votes to be cast on separate, irregular ballots rather than on the voting machine. *See* 25

P.S. § 3056(e) (explaining that although voter pulls lever on voting machine to vote for listed candidate, when voter wishes to cast write-in vote, he must do so on an irregular ballot that must be deposited in a receptacle provided in or on voting machine). Thus, an election official counting votes in an election in which Section 1216(e) applies must look both at any votes cast on the machine and at any write-in votes cast on an irregular ballot, in order to determine if a voter has double voted. Although we noted that the voting machines used in the election had a locking mechanism whereby once a voter raised a slide to cast a write-in vote, the machine locked so that the voter could not cast a vote for a candidate whose name was on the machine, we found that Section 1216(e)'s bar against write-in votes for listed candidates "erected a considerable safeguard against the failure of the locking mechanism." 333 A.2d at 906. In contrast, we noted that this safeguard was "unnecessary when dealing with paper ballots, because it is easily determined if any ballot contains more votes for a given office than there are persons to be elected." *Id.* Accordingly, we found that there were substantial reasons for the different treatment between write-in votes cast for listed candidates on voting machines and write-in votes cast for listed candidates on paper ballots, and therefore held that Section 1216(e) did not violate the uniformity clause and reversed the trial court's order declaring Frederick the winner of the election. *See id.* at 906–07.

In considering the statute at issue in the instant case, Section 1112–A(b)(3), we initially point out that although it does not specifically authorize a voter to cast a write-in vote for a candidate whose name is already printed on the ballot, it also does not declare that such a write-in vote must be voided and may not be counted. Thus, contrary to Shambach's claims otherwise, we do not find that Section 1112–A(b)(3) plainly requires that write-in votes cast for listed candidates cannot be counted. We further note that Section 1112–A(b)(3) was enacted after both Section 1003(e) and Section 1216(e) as well as our decisions in *Appeal of James* and *Appeal of Yerger* interpreting those respective statutes, and yet the General

Assembly modeled the language in Section 1112 A(b)(3) on that in Section 1003(e), rather than that in Section 1216(e). *Compare* 25 P.S. § 3031.12(b)(3), *i.e.,* Section 1112–A(b)(3) (when casting a write-in vote, a voter may add *"the name of any person not already printed on the ballot for that office "*) (emphasis added), *and* 25 P.S. § 2963(e), *i.e.,* Section 1003(e) (in the write-in space, an "elector may insert *the name of any person or persons whose name is not printed on the ballot as a candidate for such office "*) (emphasis added), *with* 25 P.S. § 3056(e), *i.e.,* Section 1216(e) ("no irregular ballot shall be cast on a voting machine for any person for any office, whose name appears on the machine as a candidate for that office, *and any ballot so cast shall be void and not counted "*) (emphasis added). Like the Commonwealth Court below, we find that the General Assembly's decision in this respect to be significant. In fact, we agree with the Commonwealth Court that we can presume from the General Assembly's decision to model Section 1112–A(b)(3) after Section 1003(e) that it intended Section 1112–A(b)(3) to be interpreted the same way that we interpreted Section 1003(e) in *Appeal of James.*[16] *See* 1 Pa.C.S. § 1922(4); *Appeal of Borough of Aliquippa,* 405 Pa. 421, 175 A.2d 856, 862 (1961). Accordingly, we hold that Section 1112–A(b)(3), like Section 1003(e), must be liberally construed to protect voters' right to vote, and therefore, write-in votes cast for listed candidates may be counted so long as the voter's intent is clear and there is no sign of fraud.

While Shambach argues that Section 1112–A(b)(3) must be construed like Section 1216(e) because the reasons we found to substantiate Section 1216(e)'s bar in *Appeal of Yerger* also substantiate a bar pursuant to Section 1112–A(b)(3), we refuse

---

**16.** Significantly, Section 1112–A(a)(3), which concerns write-in votes made on purely electronic voting systems, *i.e.,* systems where paper ballots and ballot cards are not used, contains language mirroring that in Section 1216(e). *See* 25 P.S. § 3031.12(a)(3) ("No write-in vote shall be cast on a voting device for any person for any office, whose name appears on the ballot label as a candidate for that office, *and any ballot so cast shall be void and not counted.")* (emphasis added). As such, it is apparent that the General Assembly, at the time it enacted Section 1112–A(b)(3), knew how to expressly prohibit write-in votes for candidates already listed on the ballot and simply chose not to do so in Section 1112–(A)(b)(3).

to read an all-out prohibition into Section 1112–A(b)(3) where one is not explicitly required, particularly given this Commonwealth's longstanding policy to protect the elective franchise. Furthermore, we simply do not agree that the reasons for Section 1216(e)'s bar are present with respect to Section 1112–A(b)(3).

Unlike Section 1216(e), Section 1112–A(b)(3) governs voting systems where voters cast their votes on paper ballots or ballot cards, but automatic tabulating equipment is used to count the votes. Pursuant to an optical scanning system, which is the type of Section 1112–A(b)(3) system that was used in the instant case, voters either place a mark or punch a hole on the ballot cards in an oval next to the name of the candidate of their choice, and "an optical ballot scanner read[s] the cards." *In re: Pennsylvania General Election for Snyder County Commissioner*, 841 A.2d at 596 n. 5. The ballot cards also have a line on them for voters to cast write-in votes. *See* 25 P.S. § 3031.12(b)(3). However, as the Commonwealth Court pointed out, "although a ballot scanner can read marks properly placed on, or holes properly punched in, a ballot card, ballot scanners cannot read write-in votes." *In re: Pennsylvania General Election for Snyder County Commissioner*, 841 A.2d at 596 n. 5. Thus, an election official must always review the ballot card where a write-in vote has been cast in order to tabulate that vote. Moreover, because the write-in votes are cast on ballot cards that also contain the votes cast for listed candidates, the election official may easily examine the entire ballot card to determine whether a voter has impermissibly double voted.[17] Under these circumstances, it is apparent that the tabulation of the write-in votes at issue in the instant case, unlike the tabulation of the write-in votes cast in *Appeal of*

17. Shambach argues that the election official tabulating the write-in votes cannot examine the entire ballot because there is no provision in the Election Code requiring him to do so. However, we cannot agree that the official must limit his review of the ballot to the space provided for write-in votes simply because there is no statute directing him to look elsewhere on the ballot. Rather, we find that the official must always review the entire ballot because if he failed to do so, there would be no clear way to discern if the voter who cast the write-in vote double voted.

*Yerger*, will not undermine the efficiency of the voting system or make it possible for voters to cast more than one vote for a single candidate. Thus, the concerns that drove our decision to prohibit write-in votes for listed candidates in *Appeal of Yerger* are simply not present with respect to the optical scanning system used here.

In sum, we agree with the Commonwealth Court below that Section 1112–A(b)(3) must be liberally construed to allow for the calculation of write-in votes made on behalf of a candidate already listed on a ballot where there is no evidence of fraud and the voter's intent is clear. Moreover, because in the instant case, Shambach does not claim, and the evidence does not show, that the ten ballots containing write-in votes for Bickhart were fraudulent or improperly cast in any way, and because the trial court found that the voters who cast the ten write-in votes clearly intended to vote for Bickhart, we hold that the Commonwealth Court properly determined that these ten votes must be counted for Bickhart.

The Commonwealth Court's order is affirmed.

Chief Justice CAPPY files a dissenting opinion.

Justice CASTILLE files a dissenting opinion.

Justice NEWMAN files a concurring opinion.

Justice SAYLOR files a concurring opinion.

Justice EAKIN files a dissenting opinion.

Justice NEWMAN, Concurring.

I join the majority opinion. I write separately simply to highlight an important distinction that I perceive between *Appeal of James*, 377 Pa. 405, 105 A.2d 64 (1954), and *Appeal of Yerger*, 460 Pa. 537, 333 A.2d 902 (1975).

In *James*, eight candidates, four Republicans and four Democrats, were on the general election ballot for four positions on the Council of the Borough of Whitaker. Two of the nominated Democrats, including Samuel A. James (James), joined with two other independent candidates (who were not on the ballot)

and prepared stickers bearing their four names, with an X pre-printed next to each name to indicate a vote for each of the four individuals. The applicable statute provided that the paper ballot for the office should have four blank spaces for write-in candidates. Theodore Rushe (Rushe), one of the Republican candidates who trailed James by approximately one hundred votes for the fourth spot, challenged 151 ballots on which voters had affixed the sticker, indicating a write-in vote for James. Rushe cited Section 1003(e) of the Election Code, which provides in relevant part as follows:

> There shall also be left at the end of each group of candidates for each other office (or under the title of the office itself in case no candidates have been nominated therefor), as many blank spaces as there are persons to be voted for for such office, in which space the elector may insert the name of any person or persons **whose name is not printed on the ballot as a candidate for such office.**

25 P.S. § 2963(e) (emphasis added). This Court "observed that although James' name is reproduced twice on the ballot, he received only one vote. On what possible theory can he be denied that one X, which was the honest expression of the citizen desiring to vote for him?" *James,* 105 A.2d at 65. We explained that "[t]o look at the ballot . . . and say that James is not entitled to the vote so transparently cast for him is to negate the whole genius of our electoral machinery." *Id.* at 66. Because no fraud was involved, the will of the voters who affixed a sticker to vote for James was clear, and the voters had not attempted to vote for James twice, the Court held that "it would be a stultification of the very principle of democracy behind the Election Code to deprive [James] of election simply on the basis that the [Election] Code does not *ipsissmis verbis* [loosely, explicitly] provide for the instant manner in the ascertainment of the voter's intent." *Id.* at 66–67.

In *Yerger,* a voting machine case decided twenty years after *James,* in which William Yerger (Yerger) and Norman Fredrick (Fredrick) ran for the single office of Jackson Township Tax Collector. Yerger was declared the victor by a two-vote margin, but Frederick appealed, contending that eight write-in

votes cast for him were improperly discarded. Fredrick cited to *James* for the proposition that write-in votes clearly cast for a candidate whose name already appears on the ballot are valid absent fraud and that to hold otherwise would violate the uniformity clause of the Constitution. Yerger relied on the plain language of Section 1216(e) of the Election Code, which provides in relevant part that:

> A voter may ... vote for any person for any office, for which office his name does not appear upon the voting machine as a candidate, by an irregular ballot containing the name of such person deposited, written or affixed in or upon the appropriate receptacle or device provided in or on the machine for that purpose, and in no other manner.... **[N]o irregular ballot shall be cast on a voting machine for any person for any office, whose name appears on the machine as a candidate for that office, and any ballot so cast shall be void and not counted.**

25 P.S. 3056(e) (emphasis added).

This Court refused to count the eight ballots in favor of Frederick, concluding that the uniformity clause did not require courts to treat paper ballots and voting machine ballots alike. We distinguished *James*, which dealt with paper ballots as follows:

> It is easy to find such a basis for the difference in treatment of write-in votes on paper ballots and machines. Allowing write-in votes for those appearing on the machine would increase the time and effort required to count the votes. By ignoring the speedy and efficient means of voting for such candidates provided by the regular operation of the machine, the voter casting an irregular vote would, to that extent, defeat the very purpose of using voting machines. When dealing with a comprehensive and carefully drawn legislative scheme for the conduct of elections, we must take care not to consider the particular elements of the scheme without regard to their place in the entire structure. Otherwise, the legislative plan may be frustrated by deviations, each seemingly reasonable in itself but destructive of the carefully designed structure.

*Yerger,* 333 A.2d at 906. Our predecessors noted that, theoretically, a voter could manipulate the voting machine in a manner such that he or she would be able to vote twice for one position.[1] To protect against that possibility, the voting machines were equipped with a locking mechanism whereby the act of raising the write-in lever eliminated the option of voting for a pre-printed candidate. However, the Court believed that by forbidding write-in votes for candidates whose names already appeared on the ballot, the legislature had "erected a considerable safeguard against the failure of the locking mechanism." *Id.* This Court held that precautions against double voting "are unnecessary when dealing with paper ballots, because it is easily determined if any ballot contains more votes for a given office than" the number permitted. *Id.*

In effect, *Yerger* says that where allowing a write-in vote for a candidate already on the ballot could lead to double voting that is not easily uncovered, the Election Code provisions voiding ballots so marked should be strictly followed. *Yerger* contrasts *James* and paper ballots in general by explaining that paper ballots allow for an easy determination of whether a ballot contains more votes for a given office than there are persons to be elected. While not made entirely clear from the Opinion of this Court in *Yerger,* it appears that, if the locking mechanism failed, it would be difficult to recreate the ballot to ascertain whether the voter double voted. The present situation is more akin to *James* than *Yerger.*

In *James,* each elector was entitled to vote for four persons, so when inspecting each paper ballot, *inter alia,* the vote tabulators had to ensure that: (1) the voter cast no more than four votes; and (2) the voter did not cast more than one vote for any person, whether by marking a pre-printed name or inserting a name in the write-in section. In the case *sub judice,* the optical scanner could establish the number of votes cast for any position and indicate whether each vote was for a pre-printed candidate or a write-in, which would have to be

---

1. The voter could raise the write-in lever, cast a write-in vote, and then lower the write-in lever to permit voting for a pre-printed candidate for that office, which would register two votes for the same position.

inspected by hand regardless because the scanner cannot read write-in votes. Thus, the vote tabulators would need to inspect only those ballots where a voter voted for a write-in candidate. Upon inspection of the ballot or the generated printout thereof, the vote tabulator would ensure that: (1) the voter cast no more than two votes; and (2) the voter did not cast more than one vote for any person.

I believe that the crucial distinction between *James* and *Yerger* is that in *Yerger* there was a possibility that the voter could engage in fraud or attempt to vote twice for the same candidate in such a way that it would not be obvious to the vote tabulator. In *James*, where every ballot was manually inspected, it would be readily apparent to the vote counters whether any individual voter engaged in fraud or attempted to double vote. Likewise, in the present case, because the vote tabulators would review every ballot with a write-in indication to ascertain whose name(s) had been written-in, the concern over systematic and undiscoverable fraud and/or double voting was not present. Accordingly, the concerns articulated in *Yerger* are not implicated here and, thus, I would abide by the rule we announced in *James.*

"[T]he power to throw out a ballot for minor irregularities should be sparingly used. It should be done only for very compelling reasons." *In Re Petitions to Open Ballot Boxes,* 410 Pa. 62, 188 A.2d 254, 256 (1963). "Marking a ballot in voting is a matter not of precision engineering but of an unmistakable registration of the voter's will in substantial conformity to statutory requirements." *Appeal of Gallagher,* 351 Pa. 451, 41 A.2d 630, 632 (1945). In construing election laws while we must strictly enforce all provisions to prevent fraud our overriding concern at all times must be to be flexible in order to favor the right to vote. Our goal must be to enfranchise and not to disenfranchise. *In Re General Election, November 6, 1971,* 449 Pa. 386, 296 A.2d 782, 784 (1972).

With these lodestar principles in mind, it is clear that the invalidation of a vote is a last resort. In *Yerger,* this Court invalidated to ensure the efficiency and integrity of the elective process. Those concerns are not here manifest and,

therefore, the ten votes cast for Bickhart as a write-in candidate should be counted, because there is no indication of fraud, Bickharts pre-printed name was not marked, and only one vote for Bickhart was denoted; the intention of the voter on each ballot is plain and unambiguous.

Justice SAYLOR, Concurring.

I join the majority opinion. Unlike the Justices in dissent, I read that opinion, not as rewriting, invalidating, or negating Section 1112–A(b)(3) of the Election Code, but rather, as applying the orderly rule of law established by the long-settled precedent of *Appeal of James,* 377 Pa. 405, 105 A.2d 64 (1954), to construe the requirement of Section 1112 A(b)(3) as directory, and not mandatory, in the aftermath of an election.

In this regard, I note that Pennsylvania's Election Code, no less than any other, is steeped with requirements phrased in the imperative, not only in terms of the technical requirements for ballot completion, but also in terms of the overall conduct of elections. *See generally* 25 Pa.C.S. §§ 2600–3595.501. It would be unreasonable to assume that the General Assembly thus intended that, unless each and every such requirement is strictly adhered to by those conducting the elections, election results must be deemed void.[1] Indeed, it is widely accepted that most statutory provisions for the conduct of elections may be regarded as directory,[2] and not mandatory, after the conduct of an election, unless the statute expressly declares that the particular requirement is essential to the validity of the election, or the violation as such impacts on the election result.

1. *Accord* 29 C.J.S. ELECTIONS § 7(4) (2003) ("Election laws are, as a general rule, considered to be merely directory, even though mandatory in form."); *id.* ("In the construction of election laws the courts may not lose sight of the fact that the regulations imposed are not conditions on compliance with which the right comes into being, but are regulations intended merely to regulate the exercise of the right in an orderly way, and the election laws should not be so interpreted as to defeat the very object of their enactment.").

2. Directory provisions are those which, while they are intended to be obeyed, and will be enforced if raised before or during an election, do not require invalidation of the election or disenfranchisement of electors where discovered in the election aftermath. *See* 29 C.J.S. ELECTIONS § 214(2) (2003).

*See generally* NORMAN J. SINGER, 3A SUTHERLAND STATUTORY CONSTRUCTION, § 73.8 (6th ed.2004); 26 AM.JUR.2D ELECTIONS § 317 (2003); 29 C.J.S. ELECTIONS § 67 (2003).

Once it is accepted that some provisions of election law that are phrased in the imperative really must be deemed directory in order for the legislative purposes (including, critically, the enfranchisement of the electorate) to be accomplished, it becomes clear that it is an inherent function of the interpreters of the law (the judiciary) to distinguish between the mandatory and the directory criteria. This is precisely what the Court did in *Appeal of James* in construing the statutory language at issue in this case, and it is what distinguishes *James* from *Appeal of Yerger*, 460 Pa. 537, 333 A.2d 902 (1975), the latter of which concerned a statute in which the Legislature did expressly choose to direct the consequence of disenfranchisement for nonobservance. *See generally Flanagan v. Hynes*, 75 Conn. 584, 54 A. 737, 738 (1903) ("If there is to be disenfranchisement, it should be because the legislature has seen fit to require it in the interest of an honest suffrage, and has expressed that requirement in unmistakable language.").

On the actual merits of whether the particular election provision under review should be deemed mandatory or directory, I note that there are reasonable arguments to be made on both sides.[3] But I feel strongly that the majority is correct to follow the decided precedent of *Appeal of James*. Certainly, there are legitimate and necessary exceptions to the principle of *stare decisis*. *See generally Commonwealth v. Samuels*, 566 Pa. 109, 141–42, 778 A.2d 638, 659 (2001) (Saylor, J., dissenting). But for purposes of stability and predictability

---

**3.** Indeed, I was able to concur in the result in the recent decision in *Canvass of Absentee Ballots of Nov. 4, 2003, General Election*, 577 Pa. 231, 843 A.2d 1223 (2004), which did result in a disenfranchisement, because in that case I believed that the principles of statutory construction favored a mandatory reading of the statute under review, particularly as it involved absentee voting, an arena in which there is considerable opportunity for mischief. *Accord Wrinn v. Dunleavy*, 186 Conn. 125, 440 A.2d 261, 270 (1982). Additionally, in *Canvass of Absentee Ballots*, unlike the question presented here, the issue was of first impression, and therefore, one legitimately open for the Court's consideration.

that are essential to the rule of law, *see Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the forceful inclination of courts should favor adherence to the general rule of abiding by that which has been settled. Moreover, *stare decisis* has "special force" in matters of statutory, as opposed to constitutional, construction, because in the statutory arena the legislative body is free to correct any errant interpretation of its intentions, whereas, on matters of constitutional dimension, the tripartite design of government calls for the courts to have the final word. *See Patterson v. McLean Credit Union,* 491 U.S. 164, 172–73, 109 S.Ct. 2363, 2370, 105 L.Ed.2d 132 (1989).

Since *Appeal of James* is of a sufficiently reasoned character, and the matter of distinguishing between certain mandatory and directory provisions of election laws is a sufficiently subjective undertaking, I see little basis here for invoking the rare exception to *stare decisis* to disturb a long-settled matter of ordinary statutory construction.

Chief Justice CAPPY, Dissenting.

I respectfully dissent. Like Justice Castille and Justice Eakin, I believe that the majority opinion essentially fails to engage in the analysis that this court has no choice but to make in resolving this case—that of statutory construction under Pennsylvania's Statutory Act of 1972. 1 Pa.C.S. § .1501 *et seq.* When such an analysis of 25 P.S. § 3031.12(b)(3) is faithfully made, the outcome can only be that the ten write-in votes in question are invalid and must be struck. Simply put, the majority ignores that the words of 25 P.S. § 3031.12(b)(3) are "clear and free from all ambiguity" and therefore, cannot be disregarded under the pretext of pursuing the spirit the Election Code reflects. *See* 1 Pa.C.S. § 1921(b).

I recognize that the analysis I would follow and the result I would reach in the present appeal is contrary to this court's decision in *Appeal of James,* 377 Pa. 405, 105 A.2d 64 (1954). Although we have repeatedly acknowledged that the doctrine of stare decisis is a wise course of judicial action, *Fadgen v. Lenkner,* 469 Pa. 272, 365 A.2d 147, 152 (1976), we have also

stated that we will disregard the doctrine when faced with a prior holding that we are unable to support. *See Ayala v. Philadelphia Bd. of Pub. Educ.* 453 Pa. 584, 305 A.2d 877, 888–89 (1973). I believe that the decision in *James*, in failing to be grounded in statutory construction, was wrongly decided, and should be overruled. Therefore, I would not follow *James* in this case.[1]

For these reasons, I respectfully dissent, and would affirm the Order of the Commonwealth Court.

Justice CASTILLE, Dissenting.

I respectfully dissent. This appeal proves that easy cases, no less than the great cases and hard cases that were the subject of Justice Holmes' famous dictum, can make bad law. *Northern Securities Co. v. U.S.* 193 U.S. 197, 400–403, 24 S.Ct. 436, 468, 48 L.Ed. 679 (1904) (Holmes, J. dissenting). This case should be easy. The statute at issue here clearly and unambiguously states that the voter can write in only "the name of any person not already printed on the ballot for that office." 25 P.S. § 3031.12(b)(3). Despite the fact that there is no ambiguity in the wording of this statutory provision, and hence, nothing to "construe," the Majority eviscerates the *only* meaning this plain language can have, without articulating any jurisprudential basis for doing so.

Because there is no ambiguity, the Majority's holding amounts to a judicial negation of a legislative act. This Court clearly has the power, and occasionally the duty, to strike

---

1. The majority relies on 1 Pa.C.S. § 1922(4), which provides "[t]hat when a court of last resort has construed the language used in a statute, the General Assembly in subsequent statutes on the same subject matter intends the same construction to be placed upon such language ....", to presume that the General Assembly intended 25 P.S. § 3031.12(b)(3) to be interpreted in the same way the court interpreted 25 P.S. § 2963(e) in *James*. (Majority Opinion at 801–02.). I disagree.

Under the clear terms of § 1922(4), use of the presumption depends on "a court of last resort ha[ving] construed the language used in a statute." 1 Pa.C.S. § 1922(4). In my view, the court in *James* did not construe the language of the statute before it, as § 1922(4) requires. Therefore, I believe that the presumption cannot be used in the present case.

down a statute. However, we may do so only on grounds of unconstitutionality. *See Gustine Uniontown Associates, Ltd. v. Anthony Crane Rental, Inc., L.P.,* 842 A.2d 334, 347 (Pa. 2004) (citing *Commonwealth, Dept. of Transportation v. Taylor,* 841 A.2d 108, 113 (Pa.2004) ("Absent a valid constitutional objection . . . it is not our role to second-guess th[e] legislative judgment.")). Notwithstanding the entertaining expressions found in this Court's decision in *Appeal of James,* 377 Pa. 405, 105 A.2d 64 (1954), we do not possess a free-ranging power to strike down legislation that a Court majority finds contrary to amorphous "principles of democracy." A respect for the separation of powers should command the Majority to identify the specific constitutional provision that requires us to strike down the instant legislation. When nullification of the product of a co-equal branch of government is at stake, our jurisprudence should consist of more than reliance on noble platitudes.

The Majority never identifies the constitutional infirmity that requires it to construe this statute as if it said the opposite of what it plainly provides. Acts of the General Assembly are presumed to be constitutional, and the party alleging unconstitutionality has the heavy burden to prove otherwise. *See Ieropoli v. AC&S Corp.,* 842 A.2d 919 (Pa. 2004). "[A] statute will only be declared unconstitutional if it clearly, palpably and plainly violates the constitution." *Id.* at at 928. (quoting *Erfer v. Commonwealth,* 568 Pa. 128, 794 A.2d 325, 331 (2002)). The Majority neither acknowledges nor discusses these salutary principles requiring judicial restraint.

In addition to the Court's failure to articulate a constitutional basis for striking down this legislation, the Majority Opinion fails as a matter of "statutory construction." When interpreting statutory language, "the best indication of legislative intent is the plain language of [the] statute." *Commonwealth v. Gilmour Manufacturing Co.,* 573 Pa. 143, 822 A.2d 676, 679 (2003) (citing *Bowser v. Blom,* 569 Pa. 609, 807 A.2d 830, 835 (2002)). Statutory "[w]ords and phrases shall be construed according to rules of grammar," 1 Pa.C.S. § 1903, and "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of

pursuing its spirit." 1 Pa.C.S. § 1921(b); *see also Scheipe v. Orlando*, 559 Pa. 112, 739 A.2d 475, 478 (1999). Moreover, courts must view the language of a statute in such a way as to give effect to all of its provisions. *See* 1 Pa.C.S. § 1921(a); 1 Pa.C.S. § 1922(2); *see, also, Gilmour Manufacturing*, 822 A.2d at 679. While this Commonwealth's tradition of protecting the elective franchise may oblige courts to liberally construe election laws in favor of the right to vote, that is so *only* where there is an ambiguity in the statutory language triggering statutory construction. *See In re Canvass of Absentee Ballots of November 4, 2003 General Election*, 577 Pa. 231, 843 A.2d 1223 (2004)(collecting cases). Indeed, in *Canvass of Absentee Ballots*, we expressly rejected a contention that the "well-settled practice of construing the Election Code liberally in favor of the right to vote" required this Court to torture the meaning of the word "shall" as it appeared in the section of the Code at issue there. *Id.* at 1231,. *Canvass of Absentee Ballots* reaffirms that "all things being equal, the law will be construed liberally in favor of the right to vote but, at the same time, we cannot ignore the clear mandates of the Election Code." *Id.* at 1231. The Majority is correct that there is a longstanding and overriding policy in this Commonwealth to protect the elective franchise," *Petition of Cioppa*, 533 Pa. 564, 626 A.2d 146, 148 (1993). But this alone does not empower this Court to invalidate Section 1112–A(b)(3) of the Code. Rather, where there is no ambiguity in a statute, it must be enforced according to its terms unless it violates a provision of the constitution. *See Gustine; Taylor.*

Section 1112–A(b)(3) provides voters with a clear and logical choice between casting a vote for any candidate actually listed on the ballot or, in the alternative, writing-in a vote for a person whose name does not appear on the ballot. 25 P.S. § 3031.12(b)(3). The statute thus unambiguously limits write-in votes to candidates whose names are not already on the printed ballot. This is not an unusual or arcane restriction: indeed, it is found throughout the Code. *See id.* § 3031.12(a)(3) (in districts using electronic voting systems where votes are registered electronically, write-in votes for candidates whose

names appear on ballot shall not be cast or counted); *id.* § 2963(a), (e) (on paper ballots, voter may write-in name of person not already appearing on ballot); *id.* § 3056(e) (in voting machine districts, voter may cast irregular ballot in order to write-in name of candidate not already appearing on ballot). The legislative intent behind such a restriction seems manifest. In addition to promoting efficiency in vote tabulation, limiting write-in votes to persons whose names are not listed on the ballot is a safeguard against confusion and double-voting. There is no reason to write-in names that already appear on the ballot. Moreover, in a state with millions of voters, many people have the same name. The system in place provides a means by which voter intent can be discerned where an identified candidate has a common name.

The restriction is particularly sensible where electronic voting and tabulation is employed. Machine counting offers the prospect of greater speed and accuracy than manual counting: the more ballots that must be reviewed by human means, the less efficient the system. Also, in elections (such as the one here) where more than one seat is contested, confining write-in votes to candidates not listed is one way of ensuring that a voter cannot cast one vote for a named candidate electronically, and a second vote for the same candidate via the write-in option.

Notwithstanding the lack of ambiguity in Section 1112–A(b)(3) and its obvious salutary purpose, the Majority tortures the language of the provision until it permits a voter to do exactly what its language plainly forbids—*i.e.,* to write in the name of a person whose name is already printed on the ballot. The Majority's reading results from its ignoring the actual language of the provision under the apparent pretext of pursuing some non-constitutional object according to which we must construe the election laws as a whole. I join in Mr. Justice Eakin's view in his dissenting opinion that the "plain, lucid, unambiguous" language of this provision should control the outcome, and that the Majority's radical reconstruction of the statute is entirely inappropriate here. *See Appeal of Yerger,* 460 Pa. 537, 333 A.2d 902, 906 (1975) (" '[t]he technical-

ities of the Election Law (and they are many) are necessary for the preservation of the secrecy and purity of the ballot and must, therefore, be meticulously observed' ") (quoting *Weber Appeal,* 399 Pa. 37, 159 A.2d 901, 905 (1960)).

Instead of abiding by our obligation to enforce statutes as actually written, the Majority re-writes this statute to serve the perceived needs of an individual case. Statutes generally are not, and cannot be, written with a myopic eye to a single scenario. The fact that the Majority believes that it can determine the intent behind the ten anonymous, miscast votes here does not mean that the General Assembly overstepped its constitutional bounds in seeking to erect a *general* system of voting that ensures reliability, efficiency, and the absence of fraud. I do not know—nor does the Majority know—how may citizens in Snyder County are named "Shambach" and how many are named "Bickhart." But, write-in voters are not limited in whom they may name. They may write in a name of a person not even eligible to hold office: a minor; a non-resident; or a fictional character. Indeed, nothing exists to prevent them from voting for Elmer Fudd, as a joke, protest, or an act of civil disobedience.

The Majority's misplaced confidence that it can read the mind and intention of these unnamed voters who deliberately chose *not* to vote for the Bickhart actually listed and identified on the ballot hardly is a reliable ground for establishing a general, statewide approach to the question presented. The next contest may involve thousands of write-in votes and more common candidate names. We can assume that the General Assembly considered this prospect, and in negating the statute, the Majority has lost sight of the prospect. In its place, the Majority has reposed power in the courts to substitute their own judgments as to what individual voters intended. Under the legislative scheme, there is a logical presumption that a voter who writes a name in intends to vote for a different candidate than the one listed. That presumption should be permitted to operate.

The sole authority supporting today's judicial negation of the only possible meaning of Section1112–A(b)(3) is our 50–

year–old decision in *James*, 377 Pa. 405, 105 A.2d 64. In *James*, the challenger opposed certain "sticker votes" that were duplicative of the name of a candidate already listed on the ballot. The challenger in *James* relied on a provision of the Election Code, Section 1003(e), which stated that a voter may write-in the name of a person not already listed on the ballot. 25 P.S. § 2963. Proceeding from an asserted presumption that election laws are to be liberally construed in order to effectuate the intent of the voter and protect the right to vote, this Court held that the challenged votes were valid. As support, the Court cited only to a treatise. *James*, 105 A.2d at 65–66 (quoting 29 C.J.S., Elections, § 7, p. 27). The effect of the decision in *James* was to hold that, although Section 1003(e) did not permit the sticker votes in question, those votes were nonetheless valid because the intention of the voter was clear and the challenger did not allege or show voter fraud. *James*, 105 A.2d at 66.

Notably absent from *James* was (1) any discussion of whether the language of Section 1003(e) was ambiguous, and (2) any expression of the constitutional grounds upon which this Court was empowered to nullify unambiguous language. As with so many opinions of the late Justice Michael A. Musmanno, the broad language in *James* makes for an entertaining read. But unfortunately, the opinion is sorely lacking in sensitivity to the separation of powers and the important constitutional issues implicated by the holding. The *James* Court did not dispute that the plain language of Section 1003(e) prohibited the votes in question. Rather, the Court, in an act of judicial imperialism, simply refused to permit the statute to operate. Likewise, the Majority today simply negates Section 1112–A(b)(3) without a finding of ambiguity or an identification of the constitutional basis for such activism. I would like to think that, in the half-century that has passed since *James*, this Court has developed a greater understanding and respect for judicial restraint and separation of powers concerns.

That greater understanding and respect was actually manifest in our 1975 decision in *Yerger*, 460 Pa. 537, 333 A.2d 902. In terms of its jurisprudential approach, *Yerger* is the opposite

of *James.* Unlike *James* and today's Majority Opinion, *Yerger* both applied principles of statutory construction and recognized that a measure of deference to the legislative judgment is required before a statute may be struck down. This is particularly notable because in *Yerger*—unlike *James* and this case—the statute was challenged on specific constitutional grounds. *Yerger* involved a voting machine system, and the section of the Code at issue there, Section 1216(e), contains a restriction identical to both Sections 1003(e) and 1112–A(b)(3). *See* 25 P.S. § 3056(e). As in *James* and as here, the *Yerger* Court was faced with the question of whether certain write-in votes, allegedly cast in violation of Section 1216(e), were valid. The appellees in *Yerger* argued that the write-in votes cast in violation of Section 1216(e) must be counted because, in light of *James,* a different conclusion would violate the requirement of uniformity in laws regulating elections found in Article VII, Section 6 of the Pennsylvania Constitution.[1] This Court found Section 1216(e) to be unambiguous and concluded that it was "to be given full effect in accordance with its words unless that result is prohibited by the Constitution." 333 A.2d at 905.

Turning to the appellees' uniformity challenge, the Court noted that the uniformity clause only requires like treatment where the "same circumstances" are present, emphasizing that "the Legislature is not forbidden to draw distinctions where difference in treatment rests on some substantial basis." 333 A.2d at 906, (citing *Kerns v. Kane*, 69 A.2d 388, 393 (1949)). Although *Yerger* did not question the validity of the paper ballot holding in *James,* the Court found that there was indeed a substantial basis for affording different treatment to write-in votes where machine ballots are at issue:

> It is easy to find . . . a basis for the difference in treatment of write-in votes on paper ballots and machines. Allowing write-in votes for those [candidates already] appearing on the machine would increase the time and effort required to count the votes. By ignoring the speedy and efficient

---

1. Article VII, Section 6 of the Pennsylvania Constitution provides, with exceptions not relevant here, that "[a]ll laws regulating the holding of elections by the citizens . . . shall be uniform throughout the State. . . ."

means of voting for such candidates provided by the regular operation of the machine, the voter casting an irregular vote would, to that extent, defeat the very purpose of using voting machines.

*Yerger*, 333 A.2d at 906. In addition, the *Yerger* Court noted that there is a danger of double-voting when a machine is involved, whereas this danger is simply not present in a paper ballot system. Precautions against double-voting "are unnecessary when dealing with paper ballots, because it is easily determined if any ballot contains more votes for a given office than there are persons to be elected." *Id.* However, in the case of machine voting, restricting write-in candidates to persons not already on the ballot is a salutary protection against double-voting. *Id.* ("By forbidding write-in votes for candidates appearing on the machine, the Legislature has erected a considerable safeguard against the failure of the locking mechanism.").[2] Accordingly, *Yerger* held that the write-in votes in question, cast for the appellee despite the fact that his name already appeared on the ballot as a candidate, were invalid.

The Majority distinguishes *Yerger* because it involved a voting machine system rather than an optical scanning system employing paper ballots, as here. The Majority posits that, unlike the system used in *Yerger*, the paper balloting system here always requires an election official to review the ballot. As such, the Majority finds that the concerns animating *Yerger* do not exist in the instant case. But the Majority misses the more fundamental jurisprudential point—*Yerger* evidenced, where *James* and today's Majority Opinion do not, judicial restraint. It is ironic, to say the least, that a specifically identified constitutional challenge failed in *Yerger*, while

**2.** The "locking mechanism" adverted to in *Yerger* prevented double-voting as follows. Above the line on the machine listing the candidate's name was a slide which, when pushed up, enabled the voter to case a write-in vote. When that slide was raised, it was also supposed to lock the machine, *i.e.*, to prevent registering a vote by activating the lever for any of the listed candidates for the office. Notwithstanding this mechanical safeguard, the *Yerger* Court deemed the proscription against write-in votes for listed candidates to be a considerable, if additional, safeguard against double-voting.

amorphous, non-constitutional challenges succeeded in negating the legislation at issue in *James* and apparently have again succeeded today. If ours were not a system of separated powers, the Majority's distinction might have currency. As is, the Majority's approach is a jurisprudential step backwards from *Yerger*.

Whether voter fraud or "double voting" in fact exists in a given case was not dispositive in *Yerger*.[3] The statutory provisions at issue in *James, Yerger* and here do not repose in ballot examiners or courts the free-ranging power to attempt to ascertain voter intent or rule out fraud when a vote has been cast in violation of an explicit election statute. While voter intention is paramount in the realm of the fundamental right to vote, ascertaining that intent necessarily assumes a properly cast ballot. By enacting the proscription at issue here, the General Assembly presumably weighed the factors bearing on that question. What the General Assembly decidedly did not do is vest discretion in the executive or the judiciary to reweigh those factors in determining whether or not to count a particular vote. To distinguish among substantially identical provisions in the Code on the basis of the judiciary's assessment of the potential, or lack thereof, for fraud; the ability, or lack thereof, to accurately ascertain voter intent; or the nature and practicality of examining the ballot depending upon the type of voting system used, is to ignore the fact that the General Assembly has not provided for such an inquiry. Absent constitutional infirmity—and none has been argued here—we have no authority to reshape the election system adopted by the Assembly.

The Majority also distinguishes *Yerger* based on a factual difference in the verbiage of the statutory provisions at issue. Section 1216(e), which was at issue in *Yerger*, includes the additional instruction with respect to write-in ballots that duplicate the name of a listed candidate: "any ballot so cast shall be void and not counted." 25 P.S. § 3056(e). The

---

**3.** Indeed, *Yerger* did not discuss whether it was possible to ascertain if the eight contested votes there involved any double-votes, or even any attempt to double vote.

Majority concludes that, because Section 1112 A(b)(3) does not contain similar language—as Section 1003(e) did not in *James*—it does not plainly require write-in votes for listed candidates to be invalidated. But the *Yerger* Court did not discuss this statutory disparity or consider it grounds for distinction. Moreover, the distinction is illusory. Even though Section 1112–A(b)(3) does not say "void and not counted," the explicit proscription it enacts can have meaning *only* if improper votes are not counted. It is absurd to say that the statute does not permit write-in votes for a listed candidate, but that those votes must be counted despite a violation of the proscription. The redundancy in Section 1216(e) does not somehow operate to create ambiguity in Section 1112–A(b)(3). Finally, this factual distinction, even if it had currency, does not create power in this Court to strike down otherwise constitutional legislation.

The Election Code was enacted to ensure the accurate and efficient ascertainment of voter intention while simultaneously erecting protections against the dangers of confusion and vote fraud. When faced with an ambiguity or uncertainty in the Code, our task is to strike the proper balance between protecting the elective franchise and enforcing the salutary directives of the Code. When, however, the statute is unambiguous and does not suffer from constitutional infirmity, our task is to enforce the clear mandates of the Code. For, as we stated in *Yerger,*

> When dealing with a comprehensive and carefully drawn legislative scheme for the conduct of elections, we must take care not to consider the particular elements of the scheme without regard to their place in the entire structure. Otherwise, the legislative plan may be frustrated by deviations, each seemingly reasonable in itself but destructive of the carefully designed structure.

*Id.* at 906.

Section 1112–A(b)(3) unambiguously states that a voter cannot write-in a vote for a listed candidate. The Majority Opinion nonetheless holds that a voter may do so. In negating the statute, the Majority does not find ambiguity nor does

it identify the constitutional violation that might permit judicial negation of the provision. Absent such essential predicates, this Court lacks the power to negate the plain meaning and effect of the instant provision. I respectfully dissent.

Justice EAKIN, Dissenting.

The majority has taken the plain, lucid, unambiguous phrase "the name of any person not already printed on the ballot" and used "liberal interpretation" to make it mean "the name of any person whether already printed on the ballot or not." This is not liberal interpretation; it is judicial alchemy to which I cannot subscribe.

Legislative phrases that are clear should not give rise to judicial reinterpretation, much less the pursuit of the phantasm of legislative intent. When the legislature speaks clearly, as here, it matters not what a court wishes to divine as their collective intent, whether in pursuit of a sympathetic result or not. It is an invasion of the legislative prerogative to transmogrify clear and unambiguous words into an opposite result.