**[J-82A-2024 and J-82B-2024]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| FAITH GENSER AND FRANK MATIS | : | No. 26 WAP 2024 |
| | : | |
| | : | Appeal from the Order of the |
| v. | : | Commonwealth Court entered |
| | : | September 5, 2024, at No. 1074 CD |
| | : | 2024, Reversing the Order of the |
| | : | Court of Common Pleas of Butler |
| BUTLER COUNTY BOARD OF | : | County entered August 16, 2024, at |
| ELECTIONS, REPUBLICAN NATIONAL | : | No. MSD-2024-40116. |
| COMMITTEE, REPUBLICAN PARTY OF | : | |
| PENNSYLVANIA, AND THE | : | |
| PENNSYLVANIA DEMOCRATIC PARTY | : | SUBMITTED: September 26, 2024 |
| | : | |
| | : | |
| APPEAL OF: REPUBLICAN NATIONAL | : | |
| COMMITTEE AND REPUBLICAN PARTY | : | |
| OF PENNSYLVANIA | : | |
| | | |
| FAITH GENSER AND FRANK MATIS | : | No. 27 WAP 2024 |
| | : | |
| | : | Appeal from the Order of the |
| v. | : | Commonwealth Court entered |
| | : | September 5, 2024, at No. 1085 CD |
| | : | 2024, Reversing the Order of the |
| | : | Court of Common Pleas of Butler |
| BUTLER COUNTY BOARD OF | : | County entered August 16, 2024, at |
| ELECTIONS, REPUBLICAN NATIONAL | : | No. MSD-2024-40116. |
| COMMITTEE, REPUBLICAN PARTY OF | : | |
| PENNSYLVANIA, AND THE | : | |
| PENNSYLVANIA DEMOCRATIC PARTY | : | SUBMITTED: September 26, 2024 |
| | : | |
| | : | |
| APPEAL OF: REPUBLICAN NATIONAL | : | |
| COMMITTEE AND REPUBLICAN PARTY | : | |
| OF PENNSYLVANIA | : | |

**OPINION**

**JUSTICE DONOHUE**                                              **DECIDED: OCTOBER 23, 2024**

## I. Introduction

The Republican National Committee and the Pennsylvania Republican Party (collectively, "Republican Party" or "Appellants") challenge the Commonwealth Court's decision that the Butler County Board of Elections ("Board") was required to count provisional ballots cast by two electors after the electors were notified that their mail ballots[1] would not be counted because of their failure to follow one of the mandatory requirements for voting by mail. For the reasons discussed in this opinion, we affirm the judgment of the Commonwealth Court.

## Background

The manner in which mail-in ballots are to be submitted by a voter is prescribed in the Election Code.[2] Mail-in ballots are provided to voters in packages that contain not only the ballot, but two envelopes. One envelope, marked "Official Election Ballot," has come to be referred to as the "Secrecy Envelope." The second envelope, which we refer to as the "Declaration Envelope" or "Outer Envelope," bears information including a declaration to be signed and dated by the voter and the address for the county board of elections where the ballot will be returned. Once a voter marks the ballot, the voter is required to place the ballot into the Secrecy Envelope, seal the Secrecy Envelope, and then place the Secrecy Envelope in the Declaration Envelope. 25 P.S. § 3150.16(a).[3] We refer to these three elements of a mail-in ballot so assembled as the "Return Packet."

---

[1] As pertinent to this appeal, absentee and mail-in ballots are treated similarly under the Election Code.

[2] Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. §§ 2601-3591.

[3] "[T]he mail-in elector shall, in secret, proceed to mark the ballot …, and then fold the ballot, enclose and securely seal the same in the envelope on which is printed, stamped or endorsed 'Official Election Ballot.' This envelope shall then be placed in the second one, on which is printed the form of declaration of the elector, and the address of the elector's county board of election and the local election district of the elector." 25 P.S. § 3150.16(a).

The Declaration Envelope contains a unique bar code that links the Return Packet to the voter's registration file contained in the Statewide Uniform Registry of Electors ("SURE") System. Return Packets must be received by county boards of election by eight o'clock P.M. on the day of the election in which they are cast. *Id.* § 3150.16(c). Upon receipt, the Return Packet is reviewed for compliance with the signature, dating and Secrecy Envelope requirements.[4] Non-compliant Return Packets are set aside. The Return Packets are placed in "sealed or locked containers," where they remain, unopened, until seven o'clock in the morning on Election Day, which is when pre-canvassing of mail-in ballots may begin. *Id.* § 3146.8(a), (g)(1.1).[5]

The facts underlying this appeal are not in dispute. Two electors, Faith Genser and Frank Matis (hereinafter, "Electors"), chose to vote in the 2024 Primary Election by mail-in ballot. When completing their mail-in ballots, Electors failed to enclose their ballots in the Secrecy Envelopes before mailing their ballots to the Board. Upon receipt by the Board, both Return Packets were scanned by an Agilis Falcon machine, which measured their dimensions and predicted that both lacked a Secrecy Envelope.[6] The Board logged the receipt of Electors' mail-in ballots in the SURE System, noting the lack of a Secrecy Envelope, which triggered an automatic email ("Notice Email") to be sent to Electors.

The SURE System was established in 2002 under 25 Pa.C.S. § 1222. *In re Doyle*, 304 A.3d 1091, 1096 n.3 (Pa. 2023). The "registry is a 'single, uniform integrated computer system' maintained by the Pennsylvania Department of State which is 'a

---

[4] *See, e.g.,* N.T., 5/7/2024, at 67-68 (Director McCurdy testifying regarding the initial sorting and scanning of Return Packets).

[5] Pre-canvassing involves "the inspection and opening of all envelopes containing official … mail-in ballots, the removal of such ballots from the envelopes and the counting, computing and tallying of the votes reflected on the ballots." 25 P.S. § 2602(q.1).

[6] Mail-in ballots that lack a Secrecy Envelope when received by a county board of elections are often referred to as "naked ballots."

database of all registered electors in this Commonwealth.'" *Id.* (citing 25 Pa.C.S. § 1222(c)(1)). Each county registration commission "shall be required to use the SURE System as its general register." 25 Pa.C.S. § 1222(e). The SURE System contains voters' identifying information obtained during voter registration, and registrars, employees, and clerks of a commission who are responsible for voter registration are required to undergo training to work in the SURE System. *Doyle*, 304 A.3d at 1096 n.3 (quoting *McLinko v. Dep't of State*, 279 A.3d 539, 575 (Pa. 2022)).

All county registration commissioners are required to maintain their registration records in the SURE System and to "add, modify and delete information in the system as is necessary and appropriate." 25 Pa.C.S. § 1222(c) & (c)(4). Both county registration commissioners and the Department of State of the Commonwealth are permitted "to review and search the system and to permit the sending of notices to the appropriate officials regarding death, change of address or other information which could affect the qualifications of an applicant or the registration of a registered elector." *Id.* § 1222(c)(7). The SURE System must permit "the timely printing and transmission by commissions of district registers and all other information contained in the system as may be necessary for the operation of the polling places on Election Days." *Id.* § 1222(c)(13). Among other functions, the SURE System also identifies "registered electors who vote in an election and the method by which their ballots were cast." *Id.* § 1222(c)(20). There are uniform procedures for entering data into the SURE System, including designations of some information that must be entered and some information that may be entered. 4 Pa. Code § 183.4.

In this matter, when logging its receipt of Electors' defective Return Packets, the Board updated the ballot status in the SURE System by selecting the option "CANC – NO SECRECY ENVELOPE[.]" N.T., 5/7/2024, at 68. Selecting this option indicates that the

ballot will not be counted due to lack of a Secrecy Envelope. As a result, the Notice Email generated within the SURE System was sent to Electors and advised them as follows:

> After your ballot was received by BUTLER County, it received a new status.
>
> Your ballot will not be counted because it was not returned in a [S]ecrecy [E]nvelope. If you do not have time to request a new ballot before April 16, 2024, or if the deadline has passed, you can go to your polling place on [E]lection [D]ay and cast a provisional ballot.

Petition for Review, Ex. 1 (Declaration of Faith Genser); Ex. 2 (Declaration of Frank Matis).

On April 23, 2024, the date of the 2024 Primary in Pennsylvania, Electors appeared at their respective election districts and cast provisional ballots, as suggested by the Notice Email. When subsequently informed that their provisional ballots were not counted, Electors jointly filed a Petition for Review in the Nature of a Statutory Appeal ("Petition") in the Court of Common Pleas of Butler County ("trial court"). *See* 25 P.S. § 3157. In their Petition, Electors argued that the Board was required to count their provisional ballots pursuant to Section 3050 of the Election Code,[7] as well as the Free

---

[7] Electors contended that the Board's decision ran afoul of the following provisions:

> (5)(i) Except as provided in subclause (ii), if it is determined that the individual was registered and entitled to vote at the election district where the ballot was cast, the county board of elections shall compare the signature on the provisional ballot envelope with the signature on the elector's registration form and, **if the signatures are determined to be genuine, shall count the ballot if the county board of elections confirms that the individual did not cast any other ballot, including an absentee ballot, in the election.**
>
> (ii) A provisional ballot shall not be counted if:
>
> *        *        *

(continued…)

and Equal Elections Clause of the Pennsylvania Constitution.[8]  Electors argued that they were unlawfully disenfranchised by the Board's decision to reject their provisional ballots. In particular, they argued that the Board's decision violated the Election Code and misinterpreted this Court's decision in *Pennsylvania Democratic Party v. Boockvar*, 238 A.3d 345 (Pa. 2020) ("*Pa. Democratic Party*").

A date was set for a hearing on the Petition.  On May 7, 2024, prior to the evidentiary hearing for Electors' Petition, the trial court granted intervenor status to the Republican Party and the Pennsylvania Democratic Party ("PDP").

At the hearing, the court received testimony from Electors and Chantell McCurdy, Director of Elections for the Board.  Director McCurdy testified at length about the Board's procedure with regard to the Electors' Return Packets, including the use of the Agilis Falcon machine to detect potential defects within Return Packets, and the SURE System. She acknowledged that suspected defective ballots are flagged for further review upon receipt.  She noted that at that juncture, the Board can only speculate as to whether the ballot was not enclosed in a Secrecy Envelope because they are prohibited from opening the Return Packets until pre-canvassing and canvassing.[9]  N.T., 5/7/2024, at 33-35.

---

(F) the elector's absentee ballot or mail-in ballot is timely received by a county board of elections.

25 P.S. §§ 3050(a.4)(5)(i), (ii)(F) (emphasis added).

[8]  "Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage."  PA. CONST. art. I, § 5.

[9]  As defined by the Election Code, the process of "pre-canvassing" is "the inspection and opening of all envelopes containing official absentee ballots or mail-in ballots, the removal of such ballots from the envelopes and the counting, computing and tallying of the votes reflected on the ballots.  The term does not include the recording or publishing of the votes reflected on the ballots."  25 P.S. § 2602(q.1).  The process of "canvassing" is "the gathering of ballots after the final pre-canvass meeting and the counting, computing and tallying of the votes reflected on the ballots."  25 P.S. § 2602(a.1).  We refer to these two stages broadly as "canvassing," when the distinction is not relevant.

Electors' mail-in ballots were subsequently canvassed (i.e., the ballot was removed from the Declaration Envelope) and consistent with the Board's preliminary determination, the naked ballots were not counted. *Id.* at 26-27.

The hearing also explored the Board's "notice and cure" policy, which permits voters to remedy specific defects detected upon review when the Return Packets are received by the Board. Director McCurdy testified that while certain errors, such as missing signatures, may be cured under this policy, no such procedure exists for naked ballots. She also explained that where an elector submits both a provisional ballot and an untimely mail-in ballot, the provisional ballot is counted and the late mail-in ballot is deemed ineligible for counting.[10] Director McCurdy's testimony corroborated that on occasion, voters were "misinformed" by the automated system that they could submit provisional ballots if their mail-in ballots were rejected for lack of a Secrecy Envelope. Electors, for their part, testified that they were advised to cast provisional ballots, as evidenced by the Notice Email.

On August 16, 2024, the trial court issued a memorandum opinion and order dismissing Electors' Petition and upholding the Board's decision not to count the provisional ballots. Parsing Subsections (a.4)(5)(i) and (a.4)(5)(ii)(F) of the Election Code, the court concluded that the statute's plain language does not support the claim that a timely received but defective mail-in ballot allows for a provisional ballot to be counted in its stead. *See* Trial Court Opinion, 8/16/2024, at 16 ("Subsection 3050(a.4)(5)(ii)(F) **does not** state a provisional ballot shall not be counted if a mail-in ballot **legally capable of being counted** is timely received[.]") (emphasis in original).

---

[10] According to Director McCurdy, with missing signatures and other errors subject to the Board's curing policy, electors are permitted to fix and resubmit the defective ballot or to vote by provisional ballot. N.T., 5/7/2024, at 50.

The trial court went on to explain that the Election Code's prohibition against opening mail-in ballots before canvassing necessarily requires the Board to treat the receipt of a Return Packet as the act of casting a ballot, irrespective of what errors might be discovered within the Return Packet. *Id.* at 21. This, the trial court concluded, is consistent with the legislature's clear intent to place the onus on the voter to properly complete, enclose, and timely submit their ballot. *Id.* It emphasized that the Board's role is to examine the contents of the mail-in ballots only during canvassing to determine whether it can be counted.

The court also rejected Electors' constitutional challenges, finding no infringement of their right to vote. It reasoned that the procedural requirements of the Election Code, including those concerning provisional ballots, are designed to maintain electoral integrity and determined that because receipt of a mail-in ballot does not ensure that it will be counted, any opportunity to correct a defect—such as casting a provisional ballot—constitutes an opportunity to "cure." Citing this Court's decision in *Pa. Democratic Party*, the trial court observed that the Election Code does not mandate a notice-and-cure process for defective mail-in ballots. As such, the trial court concluded that Electors' claims did not implicate any fundamental deprivation of equal voting rights. *Id.* at 27.

Electors appealed to the Commonwealth Court, which consolidated their cases for its review. In a split decision, the Commonwealth Court held that Electors had not cast any other ballot within the meaning of Subsection (a.4)(5)(i). Accordingly, it concluded that Subsection (a.4)(5)(ii)(F) did not preclude the Board from counting their provisional ballots. *Genser v. Butler Cnty. Bd. of Elections*, 2024 WL 4051375 (Pa. Commw. Sept. 5, 2024).[11]

---

[11] The majority opinion was authored by Judge Matthew S. Wolf and joined by President Judge Renée Cohn Jubelirer; Judge Lori A. Dumas dissented without opinion.

Guided by the Statutory Construction Act,[12] the intermediate appellate court began its analysis with the language of the Election Code. The panel concluded that when reading Subsections (a.4)(5)(i) and (a.4)(5)(ii)(F) together with Section 3150.16(b)(2),[13] ambiguity results.[14] In particular, the court found that uses of the terms "vote," "voted," "received," "cast," and "ballot" in these provisions—none of which are defined within the Election Code or the Statutory Construction Act—present a contextual ambiguity within the broader statutory framework.

The court noted that while "cast" and "voted" are often treated as synonymous in everyday parlance, they bear distinct implications under the Election Code. A voter can **cast** a ballot merely by filling it out or also by delivering it to a location. *See* 25 P.S. § 3050(a.4)(3) ("After the provisional ballot has been **cast**, the individual shall place it in a [S]ecrecy [E]nvelope."); *id.* § 3050(a.4)(5)(i) (describing a voter "registered and entitled to vote at the election district where the ballot was **cast**"). However, the term "cast" does not consistently differentiate between the mere submission of a ballot and the assurance that the vote is counted, depending on the specific provision being referenced. For instance, Subsection (a.4)(4)(vii) explicitly refers to a "vote," rather than a "ballot," being

---

[12] 1 Pa.C.S. §§ 1501-1991.

[13] Pursuant to 25 P.S. § 3150.16(b)(2), an elector who requests a mail-in ballot and who is "not shown on the district register as having voted may vote by provisional ballot" under 25 P.S. § 3050(a.4)(1).

[14] The panel concluded that its prior decision in *In re Allegheny County Provisional Ballots in the 2020 General Election*, 1161 C.D. 2020, 2020 WL 6867946 (Pa. Commw. Nov. 20, 2020) (non-precedential), *appeal denied*, 242 A.3d 307 (Pa. 2020), did not compel a different result. The panel acknowledged that the decision held that Subsection (a.4)(5)(ii)(F) is unambiguous; however, it found that the *Allegheny* Court had improperly analyzed the clause in isolation, without addressing the other relevant provisions. Additionally, it noted that the *Allegheny* Court was not asked to address whether only valid ballots that will count trigger Subsection (a.4)(5)(ii)(F). *Genser*, 2024 WL 4051375, at *11 (citing *Gavin v. Loeffelbein*, 205 A.3d 1209, 1221 (Pa. 2019)).

"cast." *Id.* ("[T]he votes cast upon the challenged official provisional ballots shall be added to the other votes cast within the county.").

The court asserted that the inconsistent use of these undefined terms obfuscates the determination of when a ballot is deemed "cast" and raises the critical question of whether exercising the right to vote requires merely submitting a ballot or necessitates a more comprehensive act that includes the counting and validation of that vote. Considering these factors, along with the reasonable interpretations posited by the parties and the divergent decisions rendered by at least three courts of common pleas, the Commonwealth Court ultimately concluded that "the words of the Code are not explicit." *Genser*, 2024 WL 4051375, at *14 (citing 1 Pa.C.S. § 1921(c)) (brackets omitted).[15]

Having concluded that there is ambiguity, the intermediate appellate court turned to consideration of the factors of statutory construction to discern the intent of the General Assembly. Initially, the court explained that the overarching purpose of the Election Code is to "obtain freedom of choice, a fair election, and an honest election return" and that its language should be liberally construed in favor of the election franchise. *Genser*, 2024 WL 4051375, at *11 (citing *Pa. Democratic Party*, 238 A.3d at 355). The court further reasoned that this objective is fundamentally realized by safeguarding each qualified elector's right to vote exactly once in any given election. Pursuant to the court's rationale,

---

[15] The Commonwealth Court compared the trial court's opinion with that of two other common pleas court opinions. *Genser*, 2024 WL 4051375, at *14 (*citing Ctr. for Coalfield Just. v. Wash. Cnty. Bd. of Elections*, No. 2024-3953, slip op. at 25-27 (Wash. Cnty. Ct. Com. Pl. Aug. 23, 2024) (holding, inter alia, that the Subsection (a.4)(5)(ii)(F) is ambiguous and construing it in favor of counting provisional ballots); *Keohane v. Del. Cnty. Bd. of Elections*, No. 2023-4458, slip op. at 5 (Del. Cnty. Ct. Com. Pl. Sept. 21, 2023) (ordering provisional ballots under these same circumstances to be counted)).

The Commonwealth Court affirmed the order of the common pleas court in *Center for Coalfield Justice*, and this Court has granted further review of a related issue. *Ctr. For Coalfield Justice v. Wash. Cnty. Bd. of Elections*, 2024 WL 4272040 (Pa. Commw. Sept. 24, 2024), *appeal granted*, 2024 WL 4406776 (Pa. Oct. 5, 2024) (per curiam).

to allow zero votes would strip away the elector's freedom of choice and to permit two votes would compromise the integrity of the election return.

The court also noted that the introduction of Section 3150.16(b)(2) in 2019, along with Subsections (a.4)(5)(i) and (a.4)(5)(ii)(F), was intended to enhance convenience for eligible voters through universal mail-in voting while simultaneously preserving the integrity of the electoral process. It found that the provision allowing mail-in voters to cast a provisional ballot if they are "not shown on the district register as having voted" reflects the General Assembly's intent to permit voters to remedy their circumstances when their initial mail-in ballot is invalid or incomplete. Consequently, the court interpreted these provisions as tethering the statutory right to vote to an actual act of voting (i.e., the vote is valid and counted), rather than merely the act of submitting or mailing a ballot, thereby defining the term "voted" to encompass the validity of the ballot and the exercise of the right to vote.

Thus, the court concluded that the General Assembly did not intend for provisional ballots to be summarily rejected when an elector has previously made an unsuccessful attempt to cast a ballot. *Id.* at *16. It reasoned that this interpretation not only aligns with the text of the Election Code but also ensures that every qualified voter retains the opportunity to cast their vote precisely once, thereby safeguarding the franchise and promoting justice. The Commonwealth Court dismissed the suggestion that its ruling introduced into the Election Code a judicially-created, mandatory ballot-curing procedure, a proposition rejected by this Court in *Pa. Democratic Party*. It explained that there is a fundamental difference between the process of "curing" defects in flawed ballots and the act of casting a provisional ballot. The court clarified that while county election boards are under no obligation to establish a "notice and opportunity to cure" procedure for

defective mail-in ballots, the county boards are nonetheless required to count validly submitted provisional ballots.

Appellants and the Board filed petitions for allowance of appeal to this Court. We denied the Board's petitions for allowance of appeal, and granted review on two questions presented by Appellants, reworded as follows:

> A. Whether, contrary to this Court's binding precedent in [*Pa.*] *Democratic Party*, [] the Commonwealth Court improperly usurped the authority of the General Assembly by effectively rewriting the Election Code to engage in court-mandated curing when it held that a voter is entitled to submit a provisional ballot and have that provisional ballot counted in the election tally after the voter has timely submitted a defective absentee or mail-in ballot, contrary to the Election Code.
>
> B. Whether the Commonwealth Court erred in holding that, due to purported ambiguities in the Election Code, the Butler County Board of Elections is required to count a provisional ballot cast by an elector who received a mail-in ballot and delivered the mail-in ballot to the county board of elections without the required [S]ecrecy [E]nvelope, despite the language of 25 P.S. § 3050(a.4)(5)(ii)(F), which provides that a provisional ballot shall not be counted if the elector's absentee ballot or mail-in ballot is timely received by a county board of elections.

*Genser v. Butler Cnty. Bd. of Elections*, 2024 WL 4248971 (Pa. 2024) (per curiam).

## II. Parties' Arguments

**Appellants' Arguments**

Appellants argue that it is solely the province of the General Assembly to establish the rules for casting and counting a mail-in vote and to prescribe the consequences for noncompliance with any of those rules. Appellants' Brief at 20. Appellants state that the General Assembly has mandated that mail-in ballots comply with the signature, dating, and secrecy-envelope requirements, and those mail-in ballots that do not comply are invalidated and cannot be counted. *Id.* at 20-21. This notion, they assert, comports with

our decision in *Pa. Democratic Party*, which they interpret as holding that courts cannot mandate the curing of mail-in ballot defects when the General Assembly has not done so. *Id.* at 21. They note that since our decision in *Pa. Democratic Party*, the General Assembly has not revised the Election Code to include a "notice and cure" procedure. *Id.* at 22-23.

Appellants contend that the Commonwealth Court's conclusion that provisional voting does not equate to curing presents a "distinction without a difference" because "[i]t permits a voter to have his ballot counted" despite the errors that the General Assembly determined would invalidate a voter's "first (and only) ballot." *Id.* at 23-24. Appellants proceed to argue that even if requiring provisional ballots to be counted when a mail-in ballot is defective does not constitute curing, the Commonwealth Court's interpretation is contrary to the plain language of the Election Code. *Id.* at 24-25. Specifically, they highlight the statutory language that "[a] provisional ballot shall not be counted if the elector's absentee ballot or mail-in ballot is timely received by a county board of elections." *Id.* at 25 (quoting 25 P.S. § 3050(a.4)(5)(ii)(F)). Appellants interpret this to mean that a county board of elections cannot count any provisional ballot if the voter also submitted a "mail-ballot package[]" prior to eight o'clock P.M. on Election Day, even if it is defective and will not be counted. *Id.* at 24-26.

Further, they argue that provisional ballots are only permitted in limited circumstances. *Id.* at 26-27. Appellants believe that those voters who request a mail-in ballot but do not return them to their county board by Election Day are the only class of "would-be mail voters" who are permitted to vote by provisional ballot, pursuant to the Election Code. *Id.* at 27. Appellants support their position by looking to the statutorily prescribed affidavit that a voter who casts a provisional ballot must sign, which includes

a statement that the provisional ballot "is the only ballot that I cast in this election."[16]  *Id.* at 27-28 (quoting 25 P.S. § 3050(a.4)(2)).  If the Commonwealth Court's interpretation was correct, Appellants contend, any voter attempting to vote provisionally due to a defective mail-in ballot would be making a false statement because "they cast another ballot" in the election.  *Id.* at 28.

Appellants then challenge the Commonwealth Court's reading of Subsection (a.4)(5)(ii)(F).  *Id.* at 29.  Specifically, they highlight that the court reasoned that what must be "timely received" is a mail-in ballot that remains valid and will be counted; however, Appellants find this reading implausible, because it inserts words that do not appear in the statutory text.  *Id.* at 29-30.  Appellants argue that according to the Commonwealth Court's logic, because the validity of a mail-in ballot is not determined until canvassing after [E]lection [D]ay, a mail-in ballot "can **never** be timely received and will **never** be counted."  *Id.* at 30-31 (emphasis in original).

Similarly, Appellants argue that the Commonwealth Court's construction would permit every voter who requested a mail-in ballot to be eligible to cast a provisional ballot, because none would be shown in the register as having "already voted[.]"  *Id.* at 34-35 (citing 25 P.S. §§ 3146.6(b)(2), 3150.16(b)(2)).  This, they argue, expands provisional voting beyond what the General Assembly intended.  *Id.* at 35.  To Appellants, whether a mail-in ballot has been "voted" must be determined prior to Election Day, because that

---

[16]  The affidavit, in its entirety, provides:

> I do solemnly swear or affirm that my name is _____, that my date of birth is _____, and at the time that I registered I resided at _____ in the municipality of _____ in _____ County of the Commonwealth of Pennsylvania and that this is the only ballot that I cast in this election.

25 P.S. § 3050(a.4)(2).  The elector must also sign, provide their current address, and check the reason for casting the provisional ballot.  *Id.*

conclusion determines whether a voter may cast a provisional ballot. *Id.* Thus, Appellants argue that to reconcile the provisional ballot procedure, we must read its plain language to mean that "a mail voter has completed voting if their [Return Packet]" is timely received by eight o'clock P.M. on Election Day. *Id.* at 35-36.

Appellants then proceed to argue that not only is the Commonwealth Court's decision unsupported by the statutory language, but also there are provisions of the Election Code that preclude notice and an opportunity to cast a provisional ballot under circumstances like those presented here. *Id.* at 37-38. They note that county boards of election cannot open or inspect a Return Packet but can only log them into the SURE System as "received" and keep the ballots secure until pre-canvassing. *Id.* at 38-39. According to Appellants, any action beyond that violates the Pennsylvania Constitution's requirement that "secrecy in voting … be preserved." *Id.* at 41 (citing PA. CONST. art. VII, § 4).[17]

Additionally, Appellants argue that the Commonwealth Court's decision infringes on the General Assembly's authority, thereby violating the separation of powers doctrine. *Id.* at 42. They also contend that the Commonwealth Court's decision violates the Free and Equal Elections Clause because it creates disparate treatment of voters and ballot-validity determinations based upon where a voter lives. *Id.* at 43-44 (citing PA. CONST. art. I, § 5). Lastly, Appellants argue that affirming the Commonwealth Court's decision violates the Elections and Electors Clauses of the United States Constitution, because federal law requires that state legislatures are responsible for setting the rules for federal elections, and such an interpretation of our Election Code would go beyond the purview

---

[17] To the extent this argument implicates the use of coding in the SURE System to indicate the status of the Return Packet after receipt by the Board, we denied allowance of appeal of that issue. As to maintaining the secrecy of the ballot, the Declaration Envelopes of the Electors in this case were not opened until canvassing and the naked ballots were not counted in the canvass.

of this Court. *Id.* at 45-46 (citing U.S. CONST. art. I, § 4, cl. 1; U.S. CONST. art. II, § 1, cl. 2).[18]

**Electors' Arguments**

Electors argue that Appellants have conflated "notice and cure" procedures with Pennsylvania's "longstanding statutory provisional-ballot process," which has been in place for the last "forty-one statewide elections[,]" long before mail-in voting. Electors' Brief at 16 & 19. The notice and cure procedure, they note, permits voters to cure deficiencies in the packaging of the actual mail-in ballot they submitted. *Id.* The provisional ballot process, they explain, is a federally-required protection to prevent the disenfranchisement of voters. *Id.* at 17. To that end, Electors argue that contrary to Appellants' arguments, county boards of election are required to allow voters to submit a provisional ballot pursuant to Help America Vote Act of 2002 ("HAVA").[19] *Id.* at 18-19 (citing 52 U.S.C. § 21082(a)). The federal law, according to Electors, is intended to operate as a fail-safe mechanism to ensure that voters may preserve their right to vote. *Id.* at 19-20. As Electors emphasize, the provisional ballot process preserves the right to vote and ensures that voters cast only one ballot, as provisional ballots are not counted until the county boards of election determine that the voter has not already successfully voted in the election. *Id.* at 21.

Electors then contend that the case law relied upon by Appellants is inapposite. *Id.* at 23-24. Specifically, Electors argue that *Pa. Democratic Party* did not involve

---

[18] We did not accept allowance of appeal of the constitutional arguments raised by Appellants. The issues were not developed within their petition for allowance of appeal. *See* Republican Party's Petition for Allowance of Appeal at 19 n.5.

[19] HAVA was originally enacted as 42 U.S.C. §§ 15301-15523, then subsequently reclassified in 52 U.S.C. §§ 20901-21145.

provisional ballots which are separate from the initial ballot. *Id.* at 24-25 (citing *Genser*, 2024 WL 4051375).

Electors proceed to argue for this case to be resolved pursuant to our tools of statutory construction. *Id.* at 27. Specifically, they assert the language that a provisional ballot "shall count … if the county board of elections confirms that the individual did not cast any other ballot" and that "a ballot shall not be counted if … the elector's absentee ballot or mail-in ballot is timely received by a county board of elections" can be faithfully applied in their favor when examining that language in the context of the surrounding statutory framework. *Id.* at 27-28 (citing 25 P.S. § 3050(a.4)(5)(i)-(ii)(F)). Following the Commonwealth Court's rationale, Electors argue that failure to comply with any of the requirements set forth in Section 3150.16, including the eligibility, signature, dating, Secrecy Envelope, and timely delivery requirements renders the submitted document "a legal nullity." *Id.* at 29-30 (25 P.S. § 3150.16(a)-(c)).

In that vein, Electors dispute Appellants' argument that to "cast"[20] a mail-in ballot that cannot be counted precludes filing of provisional ballots under the Election Code. *Id.* at 30-31. Like the Commonwealth Court, Electors note that "cast" is used differently throughout the Election Code, rendering it ambiguous. *Id.* at 31-32. Should we agree that the provisions are ambiguous, Electors assert that we should interpret the statutory language in a way that "secures the right to vote." *Id.* at 32. Further, Electors argue that where a defective mail-in ballot is "timely received," this does not preclude the filing of a provisional ballot. *Id.* at 32-33. They observe that the meaning of "timely" is defined by the deadline set forth in Section 3150.16(c), i.e., eight o'clock P.M. on Election Day. *Id.* at 33. Further, what is required at that time is a "**completed** mail-in ballot." *Id.* (emphasis

---

[20] The Electors look to contemporaneous dictionary definitions of the word "cast" in support of their position. Electors' Brief at 30-31 (citing *Cast*, BLACK'S LAW DICTIONARY, 230 (8th ed. 2004) ("To formally deposit (a ballot) or signal one's choice (in a vote).")). To Electors, a vote cannot be signaled or formally deposited if it ultimately will not be counted.

in original).  This, Electors argue, means a mail-in ballot that satisfies all of the statutory requirements.  *Id.*

Because Electors view the Election Code as being ambiguous, they argue that in applying our tools of statutory construction to discern the intention of the General Assembly, we must favor the interpretation that enfranchises voters.  *Id.* at 39.  Electors explain that their interpretation enfranchises voters while also preventing double voting.  *Id.* at 41.  They argue that Appellants, on the other hand, go too far with their interpretation by precluding citizens, like themselves, from voting at all.  *Id.*  Moreover, Electors argue that the Appellants' interpretation would lead to absurd results because it treats the receipt of a Return Packet—even one that lacks a mail-in ballot—as the return of an electors' vote.  *Id.* at 42-43.

Electors then proceed to argue that interpreting the Election Code in their favor will not subject voters in different counties to different rules, but rather will establish precedent that will bind every county board of elections to follow the same rules with respect to provisional voting.  *Id.* at 46-47.  Moreover, they believe it would permit provisional votes to be counted when any defect results in the invalidation of a mail-in ballot, and that to do otherwise would run counter to the General Assembly's intent in enacting the provisional voting process.  *Id.* at 47-48.

Further, Electors insist that their interpretation does not run afoul of the Election Code's pre-canvassing rules.  *Id.* at 48.  In this respect, Electors argue that Appellants' focus on the word "inspection" is misguided, as "merely looking" at an envelope or running it through a sorting machine is not pre-canvassing because it does not involve opening, counting and computing the ballots, all of which are included in the statutory definition of pre-canvassing.  *Id.* at 49-50.  Rather, they contend that county boards are permitted to

identify and segregate defective mail-in ballots upon receipt at the election office, as it does not constitute pre-canvassing.  *Id.* at 50.

Electors also offer, in the alternative, that not counting their provisional ballots would violate their right to vote under the Free and Equal Elections Clause.  *Id.* at 51-52. Noting that the government is required to demonstrate a compelling reason when impinging on the right to vote, Electors argue that there is no reasonable basis to refuse to count their provisional ballots.  *Id.* at 52-54.  Electors view Appellants' approach as "essentially punitive in nature[,]" which they consider to be inconsistent with the Free and Equal Elections Clause's intent to promote voting.  *Id.* at 54.  Without reasonable justification to impinge upon an individual's vote, Electors contend that our Charter requires that a timely and properly completed provisional ballot be counted, "when the alternative is to disenfranchise the voter."  *Id.* at 56-57.

**Intervenor PDP's Arguments**

PDP argues that Appellants' interpretation that a mail-in ballot is "voted" whenever a Return Packet is returned cannot be reconciled "with the text or purpose of the Election Code, common sense, or the fundamental right to vote protected by the Free and Equal Elections Clause of the Pennsylvania Constitution."  PDP's Brief at 17 (citing PA. CONST. art. I, § 5).  PDP recognizes that all parties agree that a voter who has requested a mail ballot but who has not "voted" that ballot is eligible to cast a provisional ballot and have it counted.  *Id.* at 17-18 (citing 25 P.S. § 3150.16(b)(2)).  It is PDP's position that a person has not voted if the mail-in ballot they have submitted will not be counted because of a defect.  *Id.* at 18.  To PDP, that a person is eligible to vote so long as they are "not shown on the district register as **having voted**," is "best read" to mean that they have submitted a ballot that will be counted, not merely that they have submitted a Return Packet.  *Id.* at 19-20 (emphasis in original) (citing 25 P.S. § 3150.16(b)(2)).  According to PDP, this is

because the other uses of "voted" refer to more than the receipt of a Return Packet. *Id.* at 20. In particular, it notes that a provision that previously referred to a person "whose mail-in ballot is not timely received" was amended to refer to a person "whose **voted** mail-in ballot is not timely received." *Id.* (citing Act of Mar. 27, 2020, No. 12, P.L. 41, § 9 (emphasis added); *see* 25 P.S. §§ 3150.13(e), 3146.3(e)). It argues that adding "voted" would have been a meaningless legislative action if it merely meant timely received, and instead it must mean that the voters are ineligible "if they timely submit mail ballots that will actually be counted." *Id.*

PDP argues that the rest of the Election Code must be read with this understanding of "voted" in mind. *Id.* at 21-22. For instance, PDP contends that "cast," as it is used in Subsection (a.4), should be understood to mean "giving a vote." *Id.* at 21. Pursuant to PDP's understanding of "vote," this entails that the vote is "validly cast." *Id.* This understanding of "cast," PDP argues, denotes that a "ballot was counted," as opposed to "those that arrived but were discarded." *Id.* (citing 25 P.S. § 3050(a.4)). This, PDP explains, means that a "timely received" ballot, as referenced in 25 P.S. § 3050(a.4)(5)(ii)(F), is one that will be counted. *Id.* at 23. Only when another ballot is already going to be counted can a county board refuse to count a provisional ballot, according to PDP. *Id.* at 23-24.

If there is any ambiguity found in the Election Code, PDP argues, like Electors, that it must be interpreted in favor of enfranchising voters. *Id.* at 26. It contends that Appellants' construction achieves the opposite, "disenfranchising voters who attempt to vote by mail but inadvertently commit an error that is easily discernible by the county board before pre-canvassing." *Id.* at 27. Moreover, PDP argues, the principle of constitutional avoidance supports the intermediate court's reading, because even if there was merit to Appellants' interpretation of the Election Code, disenfranchising voters would

raise "a serious doubt" about the constitutionality of those provisions under our Free and Equal Elections Clause. *Id.* at 29.

PDP proceeds to challenge Appellants' arguments that counting provisional ballots is "irreconcilable" with statutory and constitutional provisions "requiring secrecy in voting, uniformity in election-administration, and separation of powers." *Id.* at 31. To PDP, because there is no opening of the envelope, the methods employed by county boards to determine that a Secrecy Envelope is missing are not prohibited by law. *Id.* Further, it maintains that notifying voters that their ballots are deficient prior to pre-canvass does not violate the secrecy requirements because it is the votes on a ballot that must remain secret, not the existence of a Secrecy Envelope. *Id.* at 32. As for uniformity, PDP argues that all counties must comply with the Election Code, and thus a decision interpreting the Election Code regarding provisional voting will not result in disparate systems across the Commonwealth.[21] *Id.* at 33. With respect to the separation of powers concerns raised by Appellants, PDP asserts that the Commonwealth Court's interpretation aligns with legislative intent, thus rendering Appellants' argument on this point meritless. *Id.*

PDP expands on its argument that the refusal to count the provisional ballots violates the Pennsylvania Constitution's Free and Equal Elections Clause. *Id.* at 34 (citing PA. CONST. art. I, § 5). It explains that the disparate treatment of any group of voters must be weighed against the state interest, and that the "magnitude of the state interest required to uphold a challenged law or practice depends on the severity of the burden it places on citizens' exercise of the franchise." *Id.* at 35-36. Because not counting a provisional ballot would "significantly interfere[]" with the fundamental right to vote, PDP asserts that the challenged law "must be narrowly tailored to promote a compelling state

---

[21] PDP asserts that Appellants failed to make this argument before the lower courts, and thus it has been waived. PDP's Brief at 33 (citing Pa.R.A.P. 302(a)). More saliently, and as noted, this Court did not accept allowance of appeal on this issue.

purpose." *Id.* at 36. PDP finds "no sound reason" to deny the right to vote entirely by both canceling a voter's mail-in ballot and refusing to count their provisional ballots as well, when other "routine errors" (e.g., failure to properly sign or date the Declaration Envelope) can be corrected or do not prohibit the submission of a provisional ballot. *Id.*[22]

## III.    History of Provisional Voting

It is helpful to contextualize the present controversy by explaining the impetus for the provisional ballot provisions of the Election Code in Section 3050(a.4)(1) et seq. In the wake of the 2000 presidential election where the United States Supreme Court stepped in to resolve a voting controversy in Florida, *Bush v. Gore*, 531 U.S. 98 (2000), there was overwhelming bipartisan support to prevent such controversies from recurring. Brian Kim, *Help America Vote Act*, 40 HARV.J.LEGIS. 579, 579-82 (2003). Congress therefore enacted HAVA, which mandated statewide voter registration systems and provided funds to states to replace voting machines and train poll workers.

---

[22]    Multiple amicus briefs have been filed in support of both parties. Republican Legislative Leaders (House Republican Leader Bryan Cutler, President Pro Tempore of the Pennsylvania Senate Kim Ward, and Majority Leader of the Pennsylvania Senate Joe Pittman), Center for Election Confidence and American First Legal Foundation, and Restoring Integrity and Trust in Elections ("RITE") all filed amicus briefs in support of Appellants. Like Appellants, their amici argue that the Commonwealth Court's decision violates this Court's decision in *Pa. Democratic Party* and usurps legislative authority by mandating that counties provide curing of defective ballots in the form provisional ballots that, they assert, should not be counted under these circumstances, pursuant to the language of the Election Code.

The Secretary of the Commonwealth and Department of State, elections officials from twenty Pennsylvania counties, AFT Pennsylvania and the Pennsylvania Alliance for Retired Americans all submitted amicus briefs in support of Electors and PDP. These amici contend that provisional ballots are distinct from a cure. Further, they argue that the history of provisional voting supports an elector's ability to cast a provisional ballot under these circumstances and the language of the Election Code, construed with an eye towards its purpose of enfranchising voters, supports counting the provisional ballots when a mail-in ballot is otherwise invalidated.

Relevantly, HAVA mandated states to provide provisional voting access as a "fail-safe" in recognition of the fact that even well-run voter registration lists were not perfectly up-to-date on Election Day and to address the other irregularities that occurred in 2000. Orion de Nevers, *What Happened to HAVA? The Help America Vote Act Twenty Years on and Lessons for the Future*, 110 GEO. L.J. ONLINE 168, 175 (2021) (citing Daniel P. Tokaji, *Early Returns on Election Reform: Discretion, Disenfranchisement, and the Help America Vote Act*, 73 GEO. WASH. L.R. 1206, 1213 (2005)); 52 U.S.C. § 21082. At the time, our Election Code in Pennsylvania did not provide for provisional voting, but the concept was not entirely new. *See, e.g.*, Act of Oct. 7, 1999, ch. 232, 1999 N.J. Sess. Law 1377 (creating provisional balloting in New Jersey).

HAVA establishes the framework and minimum requirements for provisional ballots. If an individual declares that she is registered to vote in the jurisdiction in which she desires to vote, and eligible to vote in an election for federal office, but the individual's name either does not appear on the eligible voter list, or an election official asserts that the voter is ineligible, "such individual shall be permitted to cast a provisional ballot" following the procedures set forth. Namely, state election officials must provide notice to specific voters regarding the availability of provisional ballots. 52 U.S.C. § 21082(a)(1) (providing that the election official "shall notify the individual that the individual may cast a provisional ballot in that election" where the official does not find the individual's name on the eligible voter list or asserts that the individual is not eligible). Further, the individual must execute a written affirmation to cast a provisional ballot. *Id.* § 21082(a)(2)(A) & (B) (requiring affirmation that the individual is a registered voter in the jurisdiction where they desire to vote and that they are eligible to vote in that election).

HAVA provides that an election official at the polling place shall "transmit the ballot … or the voter information contained in the written affirmation … to an appropriate State

or local election official for prompt verification under paragraph 4." *Id.* § 21082(a)(3). Then, if the individual is deemed eligible under State law to vote, the provisional ballot "shall be counted as a vote in that election in accordance with State law." *Id.* § 21082(a)(4). Therefore, "HAVA creates a right to **cast** a provisional ballot— but not to have it **counted**." de Nevers, supra, at 186 (emphasis in original). That question depends entirely on eligibility under State law.[23]

In 2002, our Election Code was amended to accommodate HAVA's provisional voting requirement. Act of Dec. 9, 2002, No. 150, P.L. 1246, *as amended* 25 P.S. § 3050. Section 3050 of the Election Code, which in its previous form already enshrined (as titled) the "Manner of Applying to Vote; Persons Entitled to Vote; Voter's Certificates; Entries to Be Made in District Register; Numbered Lists of Voters; Challenges," was augmented, though the original language and title were retained. Section 3050 is an expansive provision, but we focus on Subsection (a.4), where the General Assembly introduced provisional voting into our Election Code. 25 P.S. § 3050(a.4).

## VI. Analysis

> A. Whether, contrary to this Court's binding precedent in *Pa. Democratic Party*, the Commonwealth Court improperly usurped the authority of the General Assembly by effectively rewriting the Election Code to engage in court-mandated curing when it held that a voter is entitled to submit a provisional ballot and have that provisional ballot counted in the election tally after the voter has timely submitted a defective absentee or mail-in ballot, contrary to the Election Code.

---

[23] *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004) (explaining that because HAVA does not "strip from the states their traditional responsibility to administer elections[,]" a provisional ballot cast by a voter who was not registered in the precinct in which the provisional ballot was cast does not count under Ohio law, which provides that a voter is only eligible to vote in his or her precinct of residence).

In *Pa. Democratic Party*, Petitioner[24] filed a petition for review "seeking declaratory and injunctive relief relating primarily to five issues of statutory interpretation involving Act 77 and the Election Code," and this Court subsequently "exercised extraordinary jurisdiction to address these issues and to clarify the law of this Commonwealth in time for the 2020 General Election." *Pa. Democratic Party*, 238 A.3d at 352. Relying on the Election Code in general and Article I, Section 5 of our Charter, Petitioner sought, inter alia, "to require that the [county boards] contact qualified electors whose mail-in or absentee ballots contain minor facial defects resulting from their failure to comply with the statutory requirements for voting by mail, and provide them with an opportunity to cure those defects." *Id.* at 372. Petitioner argued that "voters should not be disenfranchised by technical errors or incomplete ballots," and the proposed notice and cure procedure would ensure "that all electors who desire to cast a ballot have the opportunity to do so, and for their ballot to be counted." *Id.*

This Court rejected that argument, concluding that Petitioner had "cited no constitutional or statutory basis that would countenance **imposing** the procedure Petitioner seeks to require (i.e., having the [county boards] contact those individuals whose ballots the [county boards] have reviewed and identified as including 'minor' or 'facial' defects ... and then afford those individuals the opportunity to cure defects ...)." *Id.* at 374 (emphasis added). We explained:

> While the Pennsylvania Constitution mandates that elections be "free and equal," it leaves the task of effectuating that mandate to the Legislature. As noted herein, although the Election Code provides the procedures for casting and counting a vote by mail, it does not provide for the "notice and opportunity to cure" procedure sought by Petitioner. To the extent that a voter is at risk for having his or her ballot rejected due to minor errors made in contravention of those

---

[24] The *Pa. Democratic Party* Court collectively referred to multiple aligned entities and persons as "Petitioner." *Pa. Democratic Party*, 238 A.3d 352.

requirements, we agree that the decision to provide a "notice and opportunity to cure" procedure to alleviate that risk is one best suited for the Legislature. We express this agreement particularly in light of the open policy questions attendant to that decision, including what the precise contours of the procedure would be, how the concomitant burdens would be addressed, and how the procedure would impact the confidentiality and counting of ballots, all of which are best left to the legislative branch of Pennsylvania's government.

*Id.* (citation omitted).

Our decision in *Pa. Democratic Party* addressed only "the 'notice and opportunity to cure' procedure **sought by Petitioner**." *Id.* (emphasis added). We were not asked to nor did we consider provisional voting. Our concern in *Pa. Democratic Party* was whether the spirit of the Election Code or Article I, Section 5 of our Constitution **mandated** a notice and curing policy for defective mail ballots. We concluded that the Constitution left the task to the legislature and that the Election Code "does not provide for the 'notice and opportunity to cure' procedure sought by Petitioner." *Id.* at 374. Again, Petitioner relied only on the Free and Equal Elections Clause and the "spirit of the Election Code." *Id.* at 373. We rejected Petitioner's attempt to impose such procedures on county election boards[25] through judicial means. *Id.*

Here, as the Commonwealth Court correctly discerned, the casting of a provisional ballot is specifically authorized in the Election Code, wholly unlike the amorphous proposed notice and cure policy discussed in *Pa. Democratic Party*. Indeed, as discussed above, the right to cast a provisional ballot is not just authorized by the Election Code, our General Assembly implemented HAVA's mandate in 2002, long before Act 77 amended the code to permit no-excuse mail-in voting. Provisional ballots exist as a fail-safe to preserve access to the right to vote.

---

[25] We have not spoken to whether or not the Election Code allows individual counties to utilize notice and cure procedures.

Nor is there any analogy to be drawn from *Pa. Democratic Party* to the case before us. As the Commonwealth Court aptly observed, no ballot is cured when a provisional ballot is counted after a mail ballot is rejected due to a fatal defect in the Return Packet. When the Commonwealth Court ordered that Electors' provisional ballots be counted by the Board, that did not displace the Board's decision not to count Electors' mail-in ballots; indeed, as required by law, those mail-in ballots were not counted. The propriety of counting a provisional ballot is a question of statutory interpretation that, unlike the proposed curing policies at issue in *Pa. Democratic Party*, flows directly from the text of the Election Code. *See* 25 P.S. §§ 3050(a.4)(1) (providing for casting provisional ballots); 3050(a.4)(5)(i) (requiring the counting of provisional ballots).

Appellants' distinction-without-a-difference argument is hollow. The procedure advocated by the Petitioners in *Pa. Democratic Party* contemplates correcting deficiencies in the Return Packet so that the mail-in ballot can be counted. We consider here the utilization of a distinct voting mechanism in the Election Code that is triggered because the mail-in ballot is not counted.

Appellants misstate both non-mandatory notice and cure procedures and statutory provisional voting rights. They argue that "[c]uring refers to fixing and **avoiding the consequences of the voter's error on the mail ballot**, not necessarily making any changes to the 'initial ballot'" and that "counting a provisional ballot in these circumstances remedies – and therefore cures – the voter's failure to comply" with the General Assembly's mandatory Secrecy Envelope protocol. Appellants' Brief at 24 (emphasis added). As developed in the following section of the opinion addressing Appellants' second issue, counting a provisional ballot occurs only when another ballot attributable to a voter has not been counted. A provisional ballot is intended to alleviate potential disenfranchisement for eligible voters. Counting Electors' provisional ballots, when their

mail ballots are void for failing to use a Secrecy Envelope, is a statutory right not contemplated in *Pa. Democratic Party*.

>    B. Whether the Commonwealth Court erred in holding that, due to purported ambiguities in the Election Code, the Butler County Board of Elections is required to count a provisional ballot cast by an elector who received a mail-in ballot and delivered the mail-in ballot to the county board of elections without the required [S]ecrecy [E]nvelope, despite the language of 25 P.S. § 3050(a.4)(5)(ii)(F), which provides that a provisional ballot shall not be counted if the elector's absentee ballot or mail-in ballot is timely received by a county board of elections.

The issue before us is narrow; it asks the Court to consider the effect of a naked mail-in ballot–that is, a mail-in ballot submitted without the Secrecy Envelope–on the statutory provisions governing the counting of provisional ballots.[26] In answering the question, the Commonwealth Court considered three provisions of the Election Code that it viewed as directly impacting the propriety of counting the provisional ballots under the circumstances. It first considered 25 P.S. 3150.16(b)(2), which defines the eligibility of mail-in electors to cast a provisional ballot. It states: "An elector who requests a mail-in ballot and who is not shown on the district register as having voted may vote by provisional ballot [under the provisional ballot provisions of the Code]." The intermediate appellate court next interpreted the pertinent provisional ballot sections which provide in pertinent part:

25 P.S. § 3050(a.4)(5)(i):

>    Except as provided in Subclause (ii) ... the county board of elections ... shall count the [provisional] ballot if [it] confirms that the individual did not cast any other ballot, including an absentee ballot, in the election.

25 P.S. § 3050(a.4)(5)(ii):

---

[26] Appellants did not challenge Electors' right to cast provisional ballots.

A provisional ballot shall not be counted if:

\*     \*     \*

> (F) the elector's absentee ballot or mail-in ballot is timely received by a county board of elections.

The Commonwealth Court found that the provisions read together and in context are ambiguous. The phrase "having voted" as used in Section 3150.16(b)(2) does not appear in Section 3050(a.4)(5)(i), which refers to "did not cast," and (5)(ii)(F) is concerned with a "mail-in ballot [that] is timely received." Because of the various usage of, in particular, the terms "cast" and "vote" in the Election Code,[27] the Commonwealth Court found the critical question to be whether exercising the right to vote requires merely submitting a ballot or necessitates the counting and validation of the vote. Given the ambiguity, by applying factors of statutory construction to discern the intent of the Legislature, the Commonwealth Court construed the terms to require "vote" and "ballot" to mean a valid vote that is counted. According to the intermediate appellate court, any other reading disenfranchises a voter in a circumstance where there is no possibility of the voter casting more than one vote.

Appellants see no ambiguity in the Election Code on this point. Their analysis would begin and end with the language of Section 3050(a.4)(5)(ii)(F), which provides that "[A] provisional ballot shall not be counted if the elector's absentee ballot or mail-in ballot is timely received by a county board of elections." They submit that the provision unambiguously means that a Board cannot count any provisional ballot if the voter submitted an Outer Envelope prior to eight o'clock P.M. on Election Day even if it is defective and a ballot will not be counted. According to Appellants, if the provisional ballot

---

[27] *See* supra pp. 8-10.

cannot be counted, there is no need to look to Section 3050(a.4)(5)(i) which only comes into play if a ballot is not excluded by Section 3050(a.4)(5)(ii)(F).

We begin and end our analysis with the identified provisional voting provisions set forth in Section 3050(a.4) and focus more specifically on the term "ballot" which is used in both provisions.[28]

This Court has previously addressed the consequences of submitting a naked ballot in *Pa. Democratic Party*, where Petitioner unsuccessfully sought a declaration that under Act 77, the county boards of election must "clothe and count naked ballots," rather than invalidate them. *Pa. Democratic Party*, 238 A.3d at 374. We reviewed the statutory text to determine whether the Secrecy Envelope requirement was mandatory or directory. This was a critical inquiry because "[a] mandatory provision is one [for which] the failure to follow … renders the proceeding to which it relates illegal and **void**. A directory provision is one the observance of which is not necessary to the validity of the proceeding." *In re Nomination Papers of Am. Lab. Party*, 44 A.2d 48, 49 (Pa. 1945) (emphasis added).

---

[28] Much of the ambiguity identified by the Commonwealth Court resulted from its attempt to reconcile the provisions of the Code defining when a mail-in voter is eligible to participate in the provisional ballot process. As noted, Appellants have not challenged Electors' right to cast a provisional ballot, and reconciling the Sections is unnecessary. Moreover, the Commonwealth Court struggled mightily to reconcile Section 3050 and Section 3150.16, and it made a convincing case that it cannot be done. These provisions were written at different times, and the General Assembly made no attempt to reconcile them. Whereas the relevant language of Section 3050 was established in the wake of HAVA, Section 3150.16 was enacted as a part of Act 77 in 2019 and the establishment of mail-in voting. Aside from tacking on Subsection (a.4)(5)(ii)(F), the General Assembly made minimal effort to align provisional voting and mail-in voting laws. For instance, Subsection 3050(a.4)(1) focuses on "casting," whereas Section 3150.16's language focuses on "voting." The Commonwealth Court's opinion convincingly demonstrates that there are differences in the formats and phrases of the provisions. Nonetheless, we need not resolve these ambiguities in applying the plain text of Subsections (a.4)(5)(i) and (a.4)(5)(ii)(F) to the facts before us.

In answering the question in *Pa. Democratic Party*, we recognized that the Election Code did not "delineate a remedy narrowly linked to the mail-in elector's failure to utilize a [S]ecrecy [E]nvelope[.]" *Pa. Democratic Party*, 238 A.3d at 374 (citing 25 P.S. § 3150.16(a) (requiring the elector to "in secret, … enclose and securely seal" the ballot in the Secrecy Envelope)). Therefore, we turned to another provision of the Election Code, Section 3146.8(g)(4)(ii), which also speaks directly to Secrecy Envelopes and identifies the appropriate remedy. *Id.* Under Section 3146.8(g)(4)(ii), if there are extraneous markings on the Secrecy Envelope "reveal[ing] the identity of the elector, the elector's political affiliation or the elector's candidate preference, the envelopes and the ballots contained therein **shall be set aside and declared void**." *Id.* (citing 25 P.S. § 3146.8(g)(4)(ii)) (emphasis added). Reading these provisions in pari materia, it became clear that the General Assembly intended that "during the collection and canvassing processes," when the Declaration Envelope is unsealed and the sealed ballot removed, "it should not be readily apparent who the elector is, with what party he or she affiliates, or for whom the elector has voted." *Id.* The Secrecy Envelope "ensures that result." *Id.* "Whatever the wisdom of the requirement," we concluded it was "neither ambiguous nor unreasonable." *Id.*

We distinguished the missing Secrecy Envelope from other minor ballot irregularities. For instance, the Court concluded that failure to place a mail-in ballot in its Secrecy Envelope is unlike writing in the name of a candidate who is already listed on the ballot, which is a "mere minor irregularit[y]" and substantially conformed to the statutory requirements. *Id.* (distinguishing *Shambach v. Bickhart*, 845 A.2d 793, 795 (Pa. 2004)). We found omitting a Secrecy Envelope to be qualitatively dissimilar from completing a ballot in the wrong color of ink. *Id.* (distinguishing *In re Luzerne Cnty. Return Bd.*, 290 A.2d 108, 109 (Pa. 1972) (citing 25 P.S. § 3063)). The Election Code directs

canvassers that "[a]ny ballot that is marked in blue, black or blue-black ink … shall be valid and counted" but it does not provide a mandatory direction to electors. *Id.* at 379. Moreover, we noted, "the Legislature neither stated nor implied that ballots completed in a different color must not be counted." *Id.* Neither of those irregularities was analogous to the directive to clothe a ballot in the Secrecy Envelope, a directive of constitutional magnitude. *Id.* (citing PA. CONST. art. VII, § 4 ("Methods of Election; Secrecy in Voting")).

Instead, we deemed the Secrecy Envelope requirement most akin to the Election Code's "in-person" ballot delivery requirement for absentee ballots considered in *In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election*, 843 A.2d 1223, 1231 (Pa. 2004) ("*Appeal of Pierce*"). In *Appeal of Pierce*, this Court considered whether absentee ballots could be delivered by third persons rather than the elector himself. The requirement that an elector deliver the absentee ballot was expressed in clear terms in the relevant Election Code provision. It stated that "the elector shall send [the absentee ballot] by mail, postage [prepaid], except where franked, or deliver it in person to [said county] board of election." *Appeal of Pierce*, 843 A.2d at 1231 (quoting 25 P.S. § 3146.6). Delivery of the absentee ballot by a third party rather than the elector himself was not a "minor irregularity." Though the provision at issue in *Appeal of Pierce* "did not expressly provide for voiding a ballot delivered by someone other than the voter," we found that reading the in-person requirement "as merely directory would render its limitation meaningless[.]" *Id.* at 1232. In *Appeal of Pierce*, we emphasized that when dealing with substantive matters, like "how to cast a reliable vote," the Court does not have a power to remedy the error. *Id.* The delivery requirement of the absentee ballots was mandatory, and "the absentee ballots of non-disabled persons who had their ballots delivered in contravention of this mandatory provision are **void**." *Id.* (citing *Am. Lab. Party Case*, 44 A.2d at 49 (providing that an act done in violation of a mandatory provision is

void)) (emphasis added). The in-person delivery requirement, like the Secrecy Envelope requirement, "served the spirit of the Code." *Pa. Democratic Party*, 238 A.3d at 345. As to both defects, we were equally staunch: any ballot submitted in contravention of the mandatory statutory provisions is void. *Id.* at 380. Thus, this Court echoed earlier declarations of the effect of such defects. The failure to follow a mandatory provision "renders the proceeding to which it relates illegal and **void**." *Am. Lab. Party Case*, 44 A.2d at 49 (emphasis added).

The import of our holding in *Pa. Democratic Party* is clear: the failure to follow the mandatory requirements for voting by mail nullifies the attempt to vote by mail and the ballot.[29] Accordingly, we conduct our analysis with this understanding.

An "issue of statutory interpretation presents a question of law over which our standard of review is de novo and our scope of review is plenary." *In re Major*, 248 A.3d 445, 450 (Pa. 2021). As dictated by our Statutory Construction Act,[30] the object of statutory interpretation "is to ascertain and effectuate the intention of the General Assembly" and, if possible, we construe statutes such as our Election Code "to give effect to all its provisions." 1 Pa.C.S. § 1921(a). When the words of our Election Code "are clear and free from all ambiguity," we do not disregard the letter of the law "under the pretext of pursuing its spirit." *Id.* § 1921(b). Thus, in ascertaining the General Assembly's legislative intent in drafting the Election Code, our primary guide is its text. *See Sivick v. State Ethics Comm'n*, 238 A.3d 1250, 1263 (2020) (stating "we begin with the presumption that unambiguous statutory language embodies that intent, requiring no further investigation"). Consequently, before we entertain an argument that the terms of

---

[29] Pursuant to Sections 3150.16(a) and 3146.6(a), signing and dating are likewise mandatory requirements to effectuate mail and absentee voting.

[30] 1 Pa.C.S. §§ 1501-1991.

a statute are ambiguous, we must "consider the statutory language in its full context" and take care not to "overlabor to detect or manufacture ambiguity where the language reveals none." *Id.* at 1264.

The pertinent facts of this case are undisputed. Electors sent their Return Packets to the Board without the mandatory Secrecy Envelope. Upon receipt of the Return Packets, the Board entered the code "CANC – NO SECRECY ENVELOPE"[31] into the SURE System based on a prediction made by the Agilis Falcon machine that Electors' Return Packets lacked Secrecy Envelopes. That code triggered the Notice Email to Electors informing them that their mail-in ballot would not be counted because their Secrecy Envelopes were missing and informed Electors of their right to cast provisional ballots on Election Day. Both Electors subsequently cast provisional ballots. During canvassing, the Electors' mail-in ballots were not counted due to missing Secrecy Envelopes, as the Agilis Falcon machine accurately predicted. The mail-in ballots were not counted and the Board also refused to count their provisional ballots.

1.      Subsection (a.4)(5)(i).

We begin with Subsection (a.4)(5)(i):

> Except as provided in subclause (ii), if it is determined that the individual was registered and entitled to vote at the election district where the ballot was cast, the county board of elections shall compare the signature on the provisional ballot envelope with the signature on the elector's registration form and, if the signatures are determined to be genuine, shall count the ballot if the county board of elections **confirms that the individual did not cast any other ballot,** including an absentee ballot, **in the election.**

25 P.S. § 3050(a.4)(5)(i) (emphasis added).

---

[31]  As Director McCurdy testified, this means "canceled, no secrecy envelope." N.T., 5/7/2024, at 138.

This provision demonstrates that when deciding whether to count a provisional ballot, the county boards must know whether an elector had "cast any other ballot … in the election." *Id.* The process of examining provisional ballots occurs after canvassing of all other ballots. A provisional ballot is a fail-safe that may be counted only after the Board determines that there is no other ballot attributable to an elector. Moreover, it is at that same time that the county boards will know definitively from canvassing whether a Return Packet contains a ballot and whether the ballot was submitted in contravention of the mandatory Secrecy Envelope requirements of the Election Code such that it is void.

Assuming the other requirements for casting a provisional ballot are met, Subsection (a.4)(5) dictates when a provisional ballot must be counted, serving the dual purpose of preventing a double vote while simultaneously protecting an elector's right to have a vote counted. Subsection (a.4)(5)(i) provides the general rule, which is that "the county board of elections ... shall count the [provisional] ballot if the county board of elections confirms that the individual did not cast any other ballot ... in the election." 25 P.S. § 3050(a.4)(5)(i).

In this case, it is undisputed that Electors' mail-in ballots were naked and therefore had to be set aside and declared void. *Pa. Democratic Party*, 238 A.3d at 378. "Void" is unambiguous. Black's Law Dictionary defines it succinctly as an adjective expressing that something has "no legal effect." *Void*, BLACK'S LAW DICTIONARY (12th ed. 2024). Here, Electors' void mail-in ballots cannot be afforded legal effect. Because Electors failed to comply with the mandatory Secrecy Envelope requirement, they failed to cast a ballot.

Under Subsection (a.4)(5)(i), a county board must confirm that the "individual did not cast any other ballot … in the election." Stated otherwise, it must confirm that it has no other ballot attributable to this individual. 25 P.S. § 3050(a.4)(5)(i). If there is no such

ballot, the Code dictates that the county boards "shall count the [provisional] ballot." *Id.* The Board acknowledged that the naked ballots could not be counted,[32] but it also treated the ballots as though they had legal effect. To construe a void ballot as a "ballot … in the election" is to give it legal effect, in direct contravention of our holding in *Pa. Democratic Party* that a mail ballot lacking a Secrecy Envelope is void. Accordingly, once the Board confirmed that Electors' ballots were void, pursuant to Subsection (a.4)(5)(i), the Board was required to count Electors' provisional ballots.

2.     Subsection (a.4)(5)(ii)(F)

Subsection (a.4)(5)(ii) describes the circumstances under which a provisional ballot will not be counted. It provides as follows:

> (ii) A provisional ballot shall not be counted if:
>
> (A) either the provisional **ballot envelope** under clause (3) or the affidavit under clause (2) is not signed by the individual;
>
> (B) the signature required under clause (3) and the signature required under clause (2) are either not genuine or are not executed by the same individual;
>
> (C) a provisional **ballot envelope** does not contain a [S]ecrecy [E]nvelope;
>
> (D) in the case of a provisional ballot that was cast under subsection (a.2)(1)(i), within six calendar days following the election the elector fails to appear before the county board of elections to execute an affirmation or the county board of elections does not receive an electronic, facsimile or paper copy of an affirmation affirming, under penalty of perjury, that the elector is the same individual who personally appeared before the district election

---

[32]  N.T., 5/7/2024, at 75 (Director McCurdy testifying that "historically [the computation board] do[es] not count any ballot that lacks a secrecy envelope").

board on the day of the election and cast a provisional ballot and that the elector is indigent and unable to obtain proof of identification without the payment of a fee;

(E) in the case of a provisional ballot that was cast under subsection (a.2)(1)(ii), within six calendar days following the election, the elector fails to appear before the county board of elections to present proof of identification and execute an affirmation or the county board of elections does not receive an electronic, facsimile or paper copy of the proof of identification and an affirmation affirming, under penalty of perjury, that the elector is the same individual who personally appeared before the district election board on the day of the election and cast a provisional ballot; or

(F) **the elector's absentee ballot or mail-in ballot is timely received by a county board of elections.**

25 P.S. § 3050(a.4)(5)(ii) (emphasis added).

Subsection (a.4)(5)(ii) is the flipside of Subsection 3050(a.4)(5)(i), as Subsection (a.4)(5)(i) describes when a provisional ballot must be counted and Subsection (a.4)(5)(ii) describes when it must not be counted. In the circumstances of this case, only Subsection (a.4)(5)(ii)(F) is implicated.[33] Just as a void ballot cannot be given legal effect in Subsection (a.4)(5)(i), it cannot be given effect in Subsection (a.4)(5)(ii)(F). As a result of the determination that the Secrecy Envelope was not used, as a matter of law, no ballot was received by eight o'clock P.M. on Election Day and thus Subsection (a.4)(5)(ii)(F) was not triggered. Therefore, the Board could not refuse to count Electors' provisional ballots.

---

[33] All other subsections address defects in connection with the provisional ballot that will disqualify it from being counted. *See* 25 P.S. § 3050(a.4)(5)(ii)(A)-(E).

Contrary to the suggestion of Appellants, the text of Subsection (a.4)(5)(ii)(F) is clear that this exception to the counting of provisional ballots is not dependent on a timely-received Declaration Envelope.[34] The text of the provision plainly refers to a "ballot," not an envelope. The provisions of Subsection (a.4)(5)(ii) conclusively establish that the General Assembly knows the distinction between envelopes and ballots. Subsections (A) and (C) of (a.4)(5)(ii) specifically refer to envelopes. Pursuant to Subsection (a.4)(3), a provisional ballot must be submitted in a "[S]ecrecy [E]nvelope" and a "provisional ballot envelope." These requirements mimic the Secrecy Envelope and Declaration Envelope used in connection with mail ballots submitted to county boards. If the General Assembly intended to trigger disqualification of a provisional ballot by the timely receipt of the Declaration Envelope, it would have said so. Instead, the General Assembly's language in Subsection (a.4)(5)(ii)(F) is straightforward—it is triggered by the timely receipt of a mail ballot. Thus, the county boards can only conclusively determine if a ballot has been timely received during canvassing when the ballots are separated from the Declaration Envelopes and Secrecy Envelopes.

Appellants, echoing the trial court, complain that this reading results in an absurdity, although their rationale is difficult to follow. They observe that at least some Return Packets will not be opened by county boards until after eight o'clock P.M. on Election Day (i.e., Return Packets not opened during pre-canvass). Consequently, Appellants believe that if the operation of Subsection (a.4)(5)(ii)(F) is dependent on the validity of a ballot, and the validity of some ballots will not be ascertainable until after the

---

[34] In this regard, the Commonwealth Court noted that under Appellants' interpretation of this provision, "the provisional ballot's status as not countable is locked in amber at the moment the Board receives a mail-in elector's [Declaration E]nvelope, without regard to whether [the Declaration Envelope even contains] a ballot[.]" *Genser*, 2024 WL 4051375, at *15.

eight o'clock P.M. deadline, then none of those ballots would be timely received because their validity is not determined until after eight o'clock P.M. on Election Day. *See* Appellants' Brief at 30-31.

Given the reality of canvassing, the result is not absurd. It is required. The facts required to decide whether to count mail-in ballots are defined by eight o'clock P.M. on Election Day. Every mail ballot that is canvassed has necessarily been timely received because the boards of elections must stop receiving Return Packets at eight o'clock P.M. on Election Day. 25 P.S. § 3150.16(c). The county boards of election must determine whether a ballot is timely received during canvassing, because that is when the Return Packets are opened. Subsection (a.4)(5)(ii)(F) is triggered by a timely-received ballot and, until pre-canvassing—which cannot begin until seven o'clock A.M. on Election Day—county boards of election cannot determine whether the Return Packet contains a ballot, and canvassing may begin as late as the "third day following the election." 25 P.S. § 3146.8(g)(2). Return Packets arriving after eight o'clock P.M. on Election Day will not be canvassed at all as a mechanical function of the Election Code. Thus, when the county boards open the Return Packet at canvassing, any ballot contained therein was necessarily received before the statutory deadline. And, simultaneously, the county boards will definitively determine whether the Return Packet contains the required Secrecy Envelope clothing the ballot. Thus, our interpretation of the Election Code is harmonious with the actual process of canvassing. It is, in fact, Appellants who are engaging in wordplay to confuse the Code and reach an absurd result whereby a void mail-in ballot renders a provisional ballot uncountable as well.

The General Assembly wrote the Election Code with the purpose of enabling citizens to exercise their right to vote, not for the purpose of creating obstacles to voting. *Luzerne Cnty.*, 290 A.2d at 109. Certainly, the requirements of the Election Code will

occasionally result in a vote not being counted when an elector fails to follow the rules for voting by mail ballot.[35] But any discernable integrity purpose of the Election Code regarding Electors' mail-in ballots was served in this case when the Board refused to count them. It is undisputed that Electors' mail-in ballots were void because they lacked the required Secrecy Envelopes as *Pa. Democratic Party* requires. *Pa. Democratic Party*, 238 A.3d at 380. No party challenges that decision and Appellants fail to substantiate their claim that chaos would ensue if similarly situated voters have their provisional votes counted after it is determined at canvassing that their mail ballot is void.

The procedures for counting provisional ballots cast by putative mail in voters are designed to preclude double voting.[36] Subsection (a.4)(5)(i) works in tandem with Subsection (a.4)(5)(ii)(F) to prevent the untenable result of permitting an elector to have the votes on two ballots counted. No party has identified any other purpose for Subsection (a.4)(5)(ii)(F). Subsection (a.4)(5)(i) dictates generally when to count a provisional ballot, and Subsection (a.4)(5)(ii)(F), like Subsections (a.4)(5)(ii)(A)-(E), fleshes out the negative implications of that rule by stating more specifically when the county boards must not count a provisional ballot. Subsections (a.4)(5)(ii)(A)-(E) deal

---

[35] *See Pa. Democratic Party,* 238 A.3d at 380 ("It is clear that the Legislature believed that an orderly canvass of mail-in ballots required the completion of two discrete steps before critical identifying information on the ballot could be revealed. The omission of a secrecy envelope defeats this intention" and leads "to the inescapable conclusion that a mail-in ballot that is not enclosed in the statutorily-mandated secrecy envelope must be disqualified.").

[36] This was the integrity concern identified by the Commonwealth Court, and we agree. *See Genser,* 2024 WL 4051375, at *7 ("Determinations about whether a provisional ballot can be counted are routinely and necessarily made after canvassing has begun, and the Board considers whether the voter has already cast a valid ballot to prevent double voting."); *see also Election Integrity Project California, Inc. v. Weber,* 113 F.4th 1072, 1098 (9th Cir. 2024) (recognizing that California's provisional ballot rules "protect against double-voting while ensuring that no otherwise eligible vote is turned away from the polls").

with the various defects in the provisional ballot packet that disqualify a provisional ballot. *See, e.g.,* 25 P.S. §§ 3050(a.4)(5)(ii)(A) (provisional ballot envelope not signed); 3050(a.4)(5)(ii)(C) (provisional ballot envelope does not contain a Secrecy Envelope). Those subsections establish the mandatory requirements for a provisional ballot, which, if not met, void the ballot. Only Subsection (a.4)(5)(ii)(F) targets the problem of double voting.

Appellants contend that "the terms 'cast' by a voter and 'timely received' by a board can and should be read in harmony to give Subsection (a.4) full force and effect as the General Assembly intended." Appellants' Brief at 32. This begs the question, give full force and effect to what? Appellants fail to offer any explanation as to how their interpretation of Subsection (a.4)(5) is in any way designed to prevent double voting, and they also fail to explain how their interpretation furthers the broader goal of the Election Code to enfranchise, rather than disenfranchise, voters. Instead, Appellants' interpretation ignores the availability of provisional voting and manufactures an absurdity whereby we must accept that the General Assembly intended to wholly disenfranchise a voter on account of a mistake with their Return Packet for no discernable purpose. *See* 1 Pa.C.S. § 1922(1) ("[W]e must **in all instances** assume the General Assembly does not intend a statute to be interpreted in a way that leads to an absurd or unreasonable result.") (emphasis added). Moreover, it is our responsibility to read and interpret the Election Code in a manner that does not violate the Constitution. It is difficult to discern any principled reading of the Free and Fair Election Clause that would allow the disenfranchisement of voters as punishment for failure to conform to the mail-in voting requirements when voters properly availed themselves of the provisional voting mechanism. Our interpretation of Subsection (a.4)(5)(ii)(F) gives effect to its purpose of preventing double voting, and it averts unnecessary disenfranchisement.

Nor does our reading render the "timely received" language as surplusage. A mail voter who completes and mails his Return Packet is not prohibited from having his provisional ballot counted if his mail ballot does not arrive by eight o'clock P.M. on Election Day. 25 P.S. § 3150.16(c). Only timely received mail ballots are counted and, therefore, only timely received mail ballots create a risk of double voting in this context. The timely received language ensures there is no double vote resulting from the counting of a provisional ballot.

Our interpretation also dovetails with other provisions of the Election Code that interact with Subsection (a.4)(5)(ii)(F). For instance, the mail-in ballot provision's deadline requirement provides that "a **completed** mail-in ballot must be received in the office of the county board of elections no later than eight o'clock P.M. on the day of the primary or election." 25 P.S. §3150.16(c) (emphasis added). This provides that a mail-in ballot that is not "completed" does not satisfy the "deadline" requirement of Section 3150.16(c), and therefore cannot be timely received. This provision would make little sense if "completed" were read to mean that the ballot itself does not contain a vote for every office, or even if it is left blank in protest. An elector's ballot is not defective merely because he or she chooses not to cast a vote for every office. In Section 3150.16(c), "completed" must then mean that the mandatory requirements for voting by mail-in ballot, defined in a provision preceding the deadline requirement, Section 3150.16(a), have been completed. If those requirements are not completed, the ballot is void.

Appellants also contend that every voter who seeks to cast a provisional ballot but has already submitted a mail ballot and signs the affidavit required under Subsection (a.4)(2) makes a false statement by affirming that "this is the only ballot that I cast in this election." 25 P.S. § 3050(a.4)(2). Again, a void ballot is not a "ballot." Where, as here, the electors have been advised that their mail ballot will not be counted, they are not

making a false statement because the act of casting the ballot itself and the ballot have been nullified. The same is true where an elector is not certain that the Return Packet will arrive on time.

Appellants argue that this result is untenable or absurd by baldly asserting that our Election Code envisions one ballot per elector, i.e., the "first (and only) ballot." Appellants' Brief at 23-24. They offer no reason related to election integrity or otherwise to support the idea that a defective attempt to vote by mail dooms a voter to disenfranchisement. Our interpretation follows the dictates of the Election Code as construed by this Court that the mandatory requirements for casting a mail ballot must be followed, thus protecting the integrity of the mail voting process. Here, the naked ballots nullified the attempts at mail voting and the ballots were voided. Appellants' reading of the Election Code ignores the General Assembly's enactment of provisional voting procedures and disregards the intent of the General Assembly as articulated by this Court that the "first ballot" was not a ballot.

Our interpretation is not novel to the Election Code, which until 2019, explicitly allowed for alternative voting methods when an absentee ballot was voided. Prior to 2019, for the absentee voter who did not meet the requirements to cast an absentee ballot on Election Day, the Election Code stated that the "absentee ballot cast by such elector shall, upon challenge properly sustained, be declared void." Act of Aug. 13, 1963, No. 379, P.L. 707, § 22 (Section 1306(b)). The elector was nonetheless permitted to procure an "Emergency Voting Form" from the court of common pleas and vote at their polling place. *Id.* Thus, the law recognized that there are not two "ballots" when the first was void. We agree that our Election Code only tolerates a "first (and only) ballot" that is counted. The Election Code offers electors the fail-safe of provisional ballots, and it contains mechanisms to prevent double voting such as Subsection (a.4)(5)(ii)(F).

Although our rationale differs from that of the Commonwealth Court, we likewise conclude that Subsection (a.4)(5)(ii)(F) does not prevent the counting of an elector's provisional ballot when the elector's mail ballot is a nullity. Provisional balloting procedures, as enacted in the Election Code and incorporating the mandate of HAVA, are designed in a way to assure access to the right to vote while also preventing double voting. While Appellants and their amici[37] argue that "election integrity" mandates that Electors' provisional ballots not be counted, we are at a loss to identify what honest voting principle is violated by recognizing the validity of one ballot cast by one voter. If Appellants presume that the General Assembly intended to disqualify the provisional ballot of a voter who failed to effectively vote by mail in order to punish that voter, we caution that such a construction is not reconcilable with the right of franchise. PA. CONST. art. I, § 5. We must presume that the General Assembly did not intend an unconstitutional interpretation of its enactments.

Conclusion

Following the commands of the Election Code as interpreted by this Court, the Board properly disregarded Electors' mail-in ballots as void. However, it erred in refusing to count Electors' provisional ballots. Subsection (a.4)(5)(i) required that, absent any other disqualifying irregularities, the provisional ballots were to be counted if there were no other ballots attributable to the Electors. There were none. Subsection (a.4)(5)(ii)(F) provides that the provisional ballot "shall not be counted if the elector's absentee ballot or mail-in ballot is timely received by a county board of elections." 25 P.S. § 3050(a.4)(5)(ii)(F). Again, there were no other ballots attributable to Electors, so none could be timely received. Therefore, Subsection (a.4)(5)(ii)(F) is inapplicable and the

---

[37] *See, e.g.*, Appellants' Brief at 18; Republican Legislative Leaders' Amicus Brief at 23-26.

command of Subsection (a.4)(5)(i) controls: "the county board of elections … shall count the [provisional] ballot." *Id.* § 3050(a.4)(5)(i). For the reasons stated above, we affirm the Commonwealth Court's order directing the Board to count Electors' provisional ballots.

Chief Justice Todd and Justices Dougherty and McCaffery join the opinion.

Justice Dougherty files a concurring opinion.

Justice Mundy files a dissenting opinion.

Justice Brobson files a dissenting opinion in which Justices Wecht and Mundy join.